**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| STANLEY MARGOLIS, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> LANTHEUS HOLDINGS, INC., PAUL M. BLANCHFIELD, BRIAN A. MARKISON, ROBERT J. MARSHALL, and AMANDA MORGAN <br><br> Defendants. | Case No. 1:25-cv-07491 <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **CLASS ACTION** <br><br> <u>Demand for Jury Trial</u> |

Stanley Margolis ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Lantheus Holdings, Inc. ("Lantheus" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Lantheus' public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Lantheus securities between February 26, 2025, to August 5, 2025, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.      Defendants provided investors with material information concerning Lantheus' expected revenue for the fiscal year 2025. Defendants' statements included, among other things, assurances in Pylarify's growth potential and overall ability to meet guided revenue based on the company's confident understanding of the pricing and competitive dynamics in Pylarify's market. Defendants routinely instilled confidence in their Lantheus' investors by repeatedly claiming PLAYRIFY's alleged market leadership and premium price point would allow the company to achieve its guided growth, despite competitive pressures.

3.      Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of Pylarify's competitive position; notably, that Lantheus was not equipped to properly assess the pricing and competitive dynamics for Pylarify; the Company failed to properly disclose that its early 2025 price increase, issued despite price erosion the year prior, created an opportunity for competitive pricing to flourish, risking Pylarify's price point, revenue, and overall growth potential.  Such statements absent these material facts caused Plaintiff and other shareholders to purchase Lantheus' securities at artificially inflated prices.

4.      Investors began to question the veracity of Defendants' public statements on May 7, 2025, when Lantheus reported its first quarter results below market expectations with Pylarify's

performance particularly falling short.  In pertinent part, Defendants announced that Pylarify sales had decreased year-over-year due to an alleged "temporal competitive disruption."  Defendants further reduced their previous full-year projections due to Pylarify's shortfall, reducing the "year-over-year range to flat to low single-digit percent growth for the full year versus our prior view of low single-digit to mid-single-digit growth."

5.     Investors and analysts reacted immediately to Lantheus' revelation. The price of Lantheus' common stock declined dramatically. From a closing market price of $104.84 per share on May 6, 2025, Lantheus' stock price fell to $80.49 per share on May 7, 2025, a decline of more than 23.2% in the span of just a single day.

6.     Notwithstanding the May 7 disclosures, Lantheus and the Individual Defendants continued to mislead investors.  Defendants continued to create the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while also minimizing risk from competition and pricing dynamics, seasonality, and macroeconomic fluctuations. During the May 7, 2025, earnings call, Defendants continued to mislead investors by further failing to disclose additional issues and difficulties arising out the ongoing competitive and pricing dynamics surrounding Pylarify, and further continuing to confidently assure investors that the competitive disruption was merely temporary and that Lantheus would "work through these competitive pressures and grow volume and revenue in 2025," in line with the downwardly revised guidance.

7.     The full truth finally emerged on August 6, 2025, when Lantheus again announced disappointing results and significantly reduced growth expectations for Pylarify, which had fallen 8.3% year-over-year, and slashed fiscal year 2025 growth projections further. Defendants again attributed the losses to the ongoing competition, impacting Pylarify's pricing dynamics.

8.      Investors and analysts again reacted promptly to Lantheus' revelations. The price of Lantheus' common stock declined dramatically. From a closing market price of $72.83 per share on August 5, 2025, Lantheus' stock price fell to $51.87 per share on August 6, 2025, a decline of about 28.8% in the span of one day.

## JURISDICTION AND VENUE

9.      Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

10.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

12.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Lantheus' stock trades on the NASDAQ Stock Market (the "NASDAQ") which is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

13.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

14.    Plaintiff purchased Lantheus securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Lantheus is attached hereto.

15.    Lantheus Holdings, Inc. is a Massachusetts corporation with its principal executive offices located at 201 Burlington Road, South Building, Bedford, MA 01730. During the Class Period, the Company's common stock traded on the NASDAQ under the symbol "LNTH."

16.    Defendant Paul M. Blanchfield ("Blanchfield") was, at all relevant times, the President of Lantheus.

17.    Defendant Brian A. Markison ("Markison") was, at all relevant times, the Chief Executive Officer and Director of Lantheus.

18.    Defendant Robert J. Marshall ("Marshall") was, at all relevant times, the Chief Financial Officer and Treasurer of Lantheus

19.    Defendant Amanda M. Morgan ("Morgan") was, at all relevant times, the Chief Commercial Officer of Lantheus.

20.    Defendants Blanchfield, Markison, Marshall, and Morgan are sometimes referred to herein as the "Individual Defendants." Lantheus together with the Individual Defendants are referred to herein as the "Defendants."

21.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Lantheus' reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the

ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

22.     Lantheus is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

23.     The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Lantheus under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

24.     Lantheus is a global company that develops, manufactures, sells, and distributes certain diagnostic and therapeutic products in three categories: Radiopharmaceutical Oncology, Precision Diagnostics, and Strategic Partnerships and Other Revenue.

25.     Pertinently, the Company's key Radiopharmaceutical Oncology product is Pylarify, a PET imaging agent used to assist in both diagnosing and subsequently treating prostate cancer.

***The Defendants Materially Misled Investors Concerning***

***Lantheus' Revenue Outlook for Fiscal Year 2025***

<u>*February 26, 2025*</u>

26.    On February 26, 2025, Defendants conducted an earnings call in conjunction with the issuance of their fourth quarter and full-year results for fiscal 2025.  During the call, Defendant Blanchfield highlighted PLYARIFY's performance, in pertinent part, as follows:

> With over $1 billion in sales, PYLARIFY remains the clear #1 utilized PSMA PET imaging agent. We plan to build on this success by growing both volume and net sales in 2025 and are confident that we will maintain our market leadership and relative price premium, even amidst competitive pressures.
>
> PYLARIFY sales for the quarter were $266 million, up 15.7% year-over-year. Growth was driven by volume as net price was up approximately 1% year-over-year, even after taking a mid-single-digit price increase at the beginning of 2024. Quarter-over-quarter, we grew volumes just shy of 2%, with net price essentially flat.
>
> . . .
>
> We took an almost 6% WACC price increase earlier in 2025 and expect PYLARIFY's clinical and commercial differentiation to continue to support its clear market leadership and premium pricing.

27.    Defendant Marshall then took over the prepared remarks, pertinently providing additional financial details and issuing Lantheus' guidance for fiscal 2025, stating:

> Revenue for the fourth quarter was $391.1 million, an increase of 10.5% and revenue for the full year was $1.534 billion, an increase of 18.3%. Now turning to the details, beginning with radiopharmaceutical oncology, which contributed $266 million of sales in the quarter, up 15.3% due primarily to the continued strength of PYLARIFY with sales of $266 million, an increase of 15.7%. The difference in growth rates is due to a nominal amount of AZEDRA sales in the prior year results.
>
> PYLARIFY posted full year sales of $1.058 billion, an increase of 24.3%.
>
> . . .
>
> Turning now to guidance for 2025 full year. And recall, we are only providing full year guidance this year.

. . .

We estimate full year net revenue to be in the range of $1.545 billion to $1.61 billion an increase of 1% to 5% over 2024. We expect PYLARIFY to grow low to mid-single digits on a net basis.

28.    During the question-and-answer session that followed, Defendants elaborated further on the Company's guidance, particularly as it relates to the competitive and pricing dynamics of Pylarify, during the following pertinent exchanges:

<Q: Anthony Charles Petrone – Mizuho Securities USA LLC – MD & Senior Equity Research Analyst of Medical Devices, Diagnostics, & Therapeutics> . . . So maybe one, just a little bit on the competitive dynamics with the new reimbursement change that's effective January 1. I know you mentioned most of your customers are now contracted, but just anything you're seeing competitively of market shifts as this new reimbursement code has come in? And then secondly, the competitors out there looking at basically a reengineered, reformulated version, if you will, of their PSMA PET agent. Just expectations on that on whether or not that's baked into the guide. And what you think that does for the competitive landscape. And congrats on a strong year all around.

<A: Brian A. Markison> Yes. Thanks, Anthony. I'll start with the back end of your question and then turn it over to Paul and Amanda for the second half -- or the first question -- part of the question anyway. With regard to a new product entrant, I think it's gallium. The images are not as good as PYLARIFY images. There's been a little bit of noise about it. I don't really see a big sort of influx to anything that's happening with PYLARIFY, so they're doing what they're doing good for them, and we're going to keep on executing our game plan. So Paul?

<A: Paul M. Blanchfield> . . . So I think as we said, I think we're incredibly excited about the CMS shift to MUC versus where we were previously expected to be from the expiry of transitional pass-through payment status. And this is clearly a benefit for PYLARIFY. But I think more broadly, as the clear leader in radiopharmaceutical diagnostics, with PYLARIFY, an incredibly strong pipeline with MK-6240, of NAV-4694, of our FAP agent earlier in development as well as some of the pending acquisitions with the addition of OCTEVY, of Neuraceq and earlier-stage theranostic pairs, I think we're incredibly pleased for the long-term growth potential, sustainability and payment dynamics related to MUC.

. . .

<A: Amanda Morgan> Yes. Thanks, Paul. So as we shared on our commentary during the call that we secured the vast majority of hospital and freestanding

imaging centers with multiyear contracts. This will enable us to continue to leverage our strategic partnerships. What I'll say is that I'm very pleased with the evolution of this strategy and the partnerships. ***We expect to continue to capitalize on PYLARIFY's clinical and commercial differentiation to support its clear market leadership and pricing premium even with the current competitive market dynamics.***

So just kind of talking a little bit more about our commercial differentiation and our clinical differentiation, from a commercial differentiation perspective, we have the largest dedicated commercial team. Additionally, we have broad payer access with more than 90% of lives having access to PYLARIFY. We have a longer half-life, which is a distribution advantage, and that enables us to optimize on our multipartner manufacturing facility network. This makes PYLARIFY widely available through a diverse supply chain, ensuring convenient and reliable supply in over 48 states.

And then from a clinical differentiation perspective, there's really 3 things. There's clarity from a diagnostic perspective, meaning accurate detection rate without the high false positive rate. We have clarity in intended patient management, which is based on robust pivotal clinical data and clarity from consistency and reader interpretation or high inter-reader agreement. So by driving differentiation through clinical and commercial differentiation, our long-term strategic partnerships and an optimal customer experience, we plan to continue to grow PYLARIFY both in volume and net sales in 2025.

. . .

<Q: Lawrence Scott Solow – CJS Securities, Inc. – Managing Director of Research> I guess I just wanted to -- just follow up on Richard's question on the cadence of the year. I guess, we can infer that the impact of price, obviously, is waning in the back half. So my question is kind of what does that mean as we look out to '26? Should we actually expect -- guidance for '26. But long term, this should sound like it's a 1-year reset. Should we expect kind of price to at least not be a headwind as we look out into '26? And the second part of that question is just, I don't know if you can give us a little more concrete numbers here, but it felt like the price impact in the back half of this year or Q4 was pretty muted. So I assume there will be some impact, right? Going forward, at least in the front half of the year.

<A: Robert J. Marshall> Yes, Larry, thanks for that question. I think your assessment is right that ***this year 2025 is going to be more reflective of the price dynamics as we anniversary through the strategic contracting with our partners***. ***And so the normal seasonality, if you will, isn't necessarily going to be reflective within the PYLARIFY franchise***. We will see seasonality that we normally see with the DEFINITY, for instance. But as we look into 2026, as we anniversary through, yes, we do have a sense of bringing those sort of foundational products in

PYLARIFY and DEFINITY back to more of a seasonally cadence sort of flow, if you will, of revenue stream.

<A: Paul M. Blanchfield> Maybe just to add, Larry, on the specific kind of pricing dynamics. ***In the second half of '24, we did see sequential declines. If you look at the first half of '24 pricing and you look at the second half of '24 pricing from an actual realized, we did see a decline***. Now that's with the overall raising prices and others that helps offset some of those. ***But that will normalize, as Bob has mentioned, as we get to the second half of '25 because those year-over-year comps are now included in that. We did take a mid-single-digit price increase at the beginning of '24. We highlighted that we did the same slightly earlier in '25 this year.***

(Emphasis added).

29.     The above statements in Paragraphs 26 to 28 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while also minimizing risk from competition and pricing dynamics, seasonality, and macroeconomic fluctuations. In truth, Lantheus' optimistic reports of Pylarify's sales growth potential and pricing normalization fell short of reality; Lantheus, despite Defendants claims, did not have an accurate understanding of the pricing and competitive dynamics of Pylarify's market.

***The Truth Begins to Emerge during Lantheus' First Quarter Earnings Report***

<u>*May 7, 2025*</u>

30.     On May 7, 2025, Defendants issued a press release announcing their first quarter fiscal 2025 results below market expectations and further lowered full-year prior projections based on Pylarify's shortfall.  In pertinent part, the release highlighted that "[s]ales of PYLARIFY were $257.7 million, a decrease of 0.5%."

31.     During the same-day earnings call that followed, Defendant Morgan elaborated on Pylarify's disappointing quarterly performance, pertinently acknowledging "temporal" setbacks while assuring investors as to Pylarify's progress, stating:

PYLARIFY sales for the first quarter were $258 million, with year-over-year volume growth, offset by low single-digit decline in net price. We have successfully executed our strategy to secure the vast majority of PYLARIFY revenue through strategic partnerships with key hospitals and freestanding imaging centers. However, with the expiry of PYLARIFY pass-through status and the implementation of mean unit cost payments for Medicare, FFS in the hospital outpatient setting *we did experience what we believe will be temporal competitive disruption among smaller non-contracted sites.*

*We plan to maintain our market leadership, and we'll continue to work through these competitive pressures and grow volume and revenue in 2025. We will achieve this by broadening our contracting efforts while maintaining our pricing premium*, expanding product availability in both earlier and later calibration time, educating on PYLARIFY's clinical and commercial differentiation and continuing to provide superior customer service.

(Emphasis added).

32.     Defendant Marshall took over the call to provide more concrete financial information relating to Pylarify's quarterly performance in his prepared remarks, and further announced reduced full-year revenue expectations due to the setback, stating, in pertinent part:

Consolidated net revenue for the first quarter was $372.8 million, an increase of 0.8%. Radiopharmaceutical oncology, *currently PYLARIFY contributed $257.7 million of sales flat with the prior year*. Precision Diagnostics revenue of $104.4 million was flat year-over-year.

. . .

Turning now to our updated interim corporate guidance for the full year 2025 . . . our view of PYLARIFY performance for the balance of the year has come into sharper focus. We are updating the implicit PYLARIFY range embedded in the previously guided stand-alone Lantheus full year view of revenue. That said, *we are shifting our implicit PYLARIFY year-over-year range to flat to low single-digit percent growth for the full year versus our prior view of low single-digit to mid-single-digit growth*.

Commentary on all other Lantheus products remains the same.

. . .

Additionally, the company advanced several R&D projects with positive ROI metrics, not previously considered in the prior guide. Therefore, R&D should be approximately 7.5% of revenue, up approximately 100 basis points for the full year.

*For now, by only incorporating our PYLARIFY update, R&D investments and including Evergreen, we now see adjusted EPS in the range of $6.60 to $6.70 versus the prior guide of $7 and $7.20.*

(Emphasis added).

33.    A question-and-answer session followed management's prepared remarks, during which Defendants engaged in multiple exchanges related to Pylarify's performance in the market, the competitive and pricing dynamics therein, and the reasoning behind Defendants' reduced expectations moving forward:

<Q: Anthony Charles Petrone – Mizuho Americas LLC – MD of Senior Medical Devices, Diagnostics & Therapeutics Equity Research Analyst> Maybe start with PYLARIFY trends in the quarter. Obviously, good detail in the prepared remarks, but maybe just a little bit more on the competitive dynamics you're seeing out there. Certainly by our math, you're looking at a fair amount of share shift here through the March ending quarter. So a little bit on the PYLARIFY competitive dynamics? And I'll have one quick follow-up on gross margin.

<A: Paul M. Blanchfield> Yes. Thanks, Anthony. So I think in the first quarter, I'll add to what we -- and Amanda provided in the prepared remarks, we -- first, *we were successful in securing the vast majority of our revenues through the strategic partnerships*. Those, as we've stated before, have largely been with our long-standing and established hospitals and freestanding imaging centers, many of them who have been with us since launch.

Those partnerships were key to stabilizing the business, especially amidst the transition to mean unit cost from a Medicare fee-for-service reimbursement perspective. They're also going to serve us incredibly well as we launch a broader portfolio. *In the quarter, we did experience short-term competitive disruption, specifically among the smaller non-contracted sites due to MUC-related reimbursement, price as well as product availability. These smaller sites have been more recent adopters of PSMA PET imaging. And as a result, they have been outpacing the broader PSMA pet market growth.*

We continue to work through competitive pressures and some of these market dynamics. *But we do plan to maintain our market leadership to grow volumes and revenues and to expand our contracting efforts with some of these higher growth later adopter accounts as well as expanding product availability to ensure that we can continue to meet the growth and ensure our growth grows closer to that of the broader market.*

. . .

<Q: Roanna Clarissa H. Ruiz – Leerink Partners LLC, Research Division – Senior MD of Infectious Disease, Endocrine & Cardiovascular Disorders & Senior Research Analyst> Morning, everyone. So I was curious, I noticed you tightened your fiscal '25 guidance a bit. Could you talk a bit more about what drivers could put you on either the low end or the high end of that guidance year-end?

. . .

<A: Robert J. Marshall> Yes, I'll take it from a guidance perspective. So Roanna, I appreciate the question. ***We've narrowed the range, but we're now coalescing around the bottom half of the prior range, and it really is about PYLARIFY***. So we're still staying in basically what we had previously guided. It's just that ***Q1 was extremely informative on how the competitive environment would manage PYLARIFY as we came off pass-through. Our original view was a pretty wide range that contemplated a range of outcomes with the first half being flattish and then with low single to mid-single digit to mid-single to high single-digit type of an outcome***. So all we've done is sort of narrow this range to sort of -- to be at the bottom, we're taking like the bottom half of that original range. ***The key thing here, though, is we do still expect healthy dose volumes throughout the balance of the year.*** And that is why we related where we do.

. . .

<Q: Brian Kemp Dolliver – Brookline Capital Markets, LLC – Director of Research & Senior Biotechnology Analyst> On the smaller accounts in the market for PYLARIFY, are these accounts that are operating essentially on a spot basis? Or are they contracted with others? I'm trying to reconcile your position as a premium priced product with what looks like a customer base that might be commodity -- have a commodity mindset. So can you reconcile that for me?

<A: Brian A. Markison> Yes. I think we're looking at it a little bit differently. I think as we have grown our business and matched that with our growing PMF network, we have 63 PMF up and running in the country and our strategic contracts were designed to partner us for the long term with our highest volume early adopters. ***And I think what we're seeing is the smaller accounts that now have some capacity, were not initially our early focus as we were dealing with the major institutions***. So Amanda, do you want to expand on that a little bit?

<A: Amanda M. Morgan> That's exactly right. As we continue to evolve, as Paul shared in his prepared remarks, as we continue to evolve in the market, we are continuing to grow and expand our product availability and that will be through our earlier and later calibration times. ***That will enable us to not only partner, as Brian said, with our largest strategic accounts, but also partner with the smaller accounts, so those later adopters that are continuing other uptake of PSMA PET.***

(Emphasis added).

34.    The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the February 26, 2025, earnings call. On that call, Defendants assured investors of Pylarify's growth potential and overall ability to meet guided revenue based on the company's confident understanding of the pricing and competitive dynamics in Pylarify's market.  Defendants repeatedly claimed Pylarify's market leadership and premium pricing would allow the company to achieve its guided growth, while continually minimizing the risks associated with competition, pricing dynamics, seasonality, and macroeconomic fluctuations.

35.    Investors and analysts reacted immediately to Lantheus' revelation. The price of Lantheus' common stock declined dramatically. From a closing market price of $104.84 per share on May 6, 2025, Lantheus' stock price fell to $80.49 per share on May 7, 2025, a decline of more than 23.2% in the span of just a single day.

36.    A number of well-known analysts who had been following Lantheus lowered their price targets in response to Lantheus' disclosures. For example, Jefferies highlighted that "For PYLARIFY, LNTH continues to maintain that strategic partnerships have been secured with the vast majority of its key customers, but it did call out 'temporal' competitive disruption among smaller, non-contracted sites."  The Analyst went on to highlight that despite the setback, "mgmt. expects PYLARIFY to grow in both vols and net sales in '25 with LNTH calling out flat to LSD growth (prior LSD to MSD)."

37.    Similarly, an analyst from Jones Research highlighted the "short-term competitive disruption" Defendants pointed to, noting that it 'was attributed to reimbursement, price, and product availability." William Blair also reduced their price target in accord, pointing to "weaker-

than-expected Pylarify revenue," as "the company now expects Pylarify to experience flat to low-single-digit percent growth.

38.    The fact that these analysts, and others, discussed Pylarify's shortfall and below-expectation projections suggests the public placed significant weight on Lantheus' prior revenue and sales estimates, as well as the Company's prior statements regarding the competitive and pricing dynamics surrounding Pylarify. The frequent, in-depth discussion of Lantheus' guidance confirms that Defendants' statements during the Class Period were material.

39.    Notwithstanding Defendants' disclosures during the call, they continued to mislead investors by misrepresenting their understanding of the issues surrounding the alleged short-term competitive pressures.   In doing so, the Defendants deceptively claimed confidence in their understanding of the competitive and pricing dynamics surrounding Pylarify and relied on such in providing estimates for future sales growth.

40.    Specifically, the above statements in Paragraphs 30 to 33 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Lantheus' projected revenue outlook and anticipated growth while also minimizing risk from competition and pricing dynamics, seasonality, and macroeconomic fluctuations. Conversely, competition had increased, impacting Lantheus' ability to close deals at its premium price point and straining Pylarify's ability to reach forecasted sales growth targets. Defendants misled investors by providing the public with materially flawed statements of confidence and growth projections which did not account for these variables.

### *The Truth Emerges during Lantheus' Second Quarter Earnings Report*

### *August 6, 2025*

41.     On August 6, 2025, Lantheus issued a press release, publishing its second quarter fiscal 2025 results.  Pylarify disappointed again, with sales of "$250.6 million, a decrease of 8.3%." Defendant Markison was quoted in the release stating the company "navigated increased competition in the PSMA PET landscape, which impacted PYLARIFY performance."

42.     An earnings call was conducted shortly following the release wherein Defendant Markison elaborated on the reasoning behind Pylarify's shortfall, stating, in pertinent part:

> This morning, we announced second quarter results that were below expectations and also lowered our financial outlook for the remainder of 2025. Before I go into the broader steps that we are taking to diversify our business and establish a new growth trajectory for the company, I want to drill down on PYLARIFY and the current dynamics in the PSMA PET market.
>
> **In the back half of the quarter, the confluence of MUC-based reimbursement and aggressive discounting by what had been a somewhat dormant F-18 competitor, led some economically sensitive customers to reassess their choice of PSMA agents. This led to the renegotiation of some existing strategic partnerships as well as a conscious decision to walk away from those volumes at certain accounts that requested pricing terms that were not in the long-term interest of our PSMA PET franchise.**
>
> **PYLARIFY also continues to be concentrated in large institutions that due to constraints continued to grow at a slower rate than the overall market**. However, our strategic partnership agreements have proven and will continue to prove effective at retaining the vast majority of our customers, who recognize PYLARIFY's clinical differentiation.
>
> This is reflected in our U.S. quarterly volume growth, 2% year-over-year and over 4% sequentially.

(Emphasis added).

43.    Defendant Marshall provided more specifics on Pylarify's performance and announced Lantheus' would be cutting its fiscal 2025 guidance for the second time in as many quarters, stating, in pertinent part:

> Consolidated net revenue for the second quarter was $378 million, a decrease of 4.1%. Radiopharmaceutical oncology currently **PYLARIFY contributed $250.6 million of sales, down 8.3%, lower than previously expected**. Our U.S. volumes were up over 4% sequentially, as described by Paul, **competitive dynamics have driven the net price environment lower than expected.**
>
> . . .
>
> Turning now to our updated guidance for full year 2025. Based on market dynamics, our go-forward strategy and extrapolating out from what we saw in the latter part of Q2 and accounting for anticipated mix of wins and losses, **we are adjusting our PYLARIFY range to $940 million to $965 million.**
>
> We do not anticipate any changes to other existing products but for the inclusion of LMI in our forward view, specifically Neuraceq, which we expect to be in the range of $40 million to $45 million and $0.04 of EPS contribution for partial Q3 and full Q4 inclusion. Taken together, full year revenue is now expected to be in a range of $1.475 billion to $1.51 billion from the prior range of $1.55 billion to $1.585 billion.
>
> Taking these revenue changes into consideration and the inclusion of LMI, we now **see adjusted EPS in the range of $5.50 to $5.70 versus the prior guide of $6.60 and $6.70**

44.    During the question-and-answer segment, Defendant Blanchfield elaborated on changes to the Company's guidance, stating, in pertinent part:'

> Notably, **we expect net price to continue to decline sequentially in both the third and the fourth quarter for PYLARIFY**. This is due to the pricing actions in both renegotiations that took place in the second quarter in the back half that will then fully quarterize, if you will, for the third quarter as well as in the fourth quarter.
>
> And then we also expect to see some impact on best price or 340B. That's a 2-quarter lag from a government pricing perspective. And so **volumes for PYLARIFY will continue to grow as they have in the first half of this year, but we will see that less in the market, and we will see further price degradation given some of the competitive dynamics and those are the underlying assumptions baked within our guidance.**

(Emphasis added).

45.     Notably, Defendant Morgan was absent from Lantheus' earnings call on August 6, 2025.  While there was no mention on the call of Defendant Morgan's absence, the Company later reveled, through an 8-K filing on August 11, 2025, that Defendant Morgan "has informed the Company that, effective August 8, 2025, she is taking leave from the Company for personal reasons."

46.     The aforementioned press releases and statements made by the Individual Defendants contradicted their earlier statements, including those made during the May 7, 2025, earnings call. During that call, the Defendants portrayed an understanding of the issues surrounding the alleged temporary competition impacting Pylarify's sales growth, reiterated confidence in Pylarify's growth potential and premium price point, as well as making below-market projections that allegedly factored in the risks raised by the ongoing competition and pricing dynamics. Conversely, competition had begun to worsen, as the gap left by Pylarify's premium pricing was filled by an aggressively discounted competitor.

47.     Investors and analysts again reacted promptly to Lantheus' revelations. The price of Lantheus' common stock declined dramatically. From a closing market price of $72.83 per share on August 5, 2025, Lantheus' stock price fell to $51.87 per share on August 6, 2025, a decline of about 28.8% in the span of one day.

48.     A number of well-known analysts who had been following Lantheus lowered their price targets again in response to Lantheus' additional disclosures. For example, William Blair, while "reiterating [their] Market Perform rating on Lantheus shares despite the roughly 30% sell-off," pertinently highlighted Pylarify's disappointing results and outlook as follows:

> Revenue came in below expectations at $378 million, versus Street . . . attributable to increased competition, likely from Posluma, that resulted in loss of market share. While volume increased 4% sequentially (for context, [competitor] Telix [TLX

$11.94; Outperform] experienced 7% sequent5ial growth for Illuccix) compared to previous periods, Pylarify experienced a 2.8% sequential decline and an 8.3% year-over-year decrease in revenue.

. . .

Despite observing signs of market stabilization, management conceded that it expects continued share loss, coupled with net price decline, in both the third … and fourth quarter.

49.     Similarly, Jones Research called attention to Lantheus' reduced guide and discussions on "how sustained competitive pressure is creating headwinds for the company's lead asset, PYLARIFY," and further noted that while "LNTH expects PYLARIFY volume growth to remain positive through FY25," Defendants forecast that growth "below that of the broader PSMA-PET imaging market."

50.     Jefferies also slashed its price target on Pylarify's disappointing results, noting that the Defendants' claim that competition "caused some economically sensitive customers to reassess their choice of agents, led to a renegotiation of some existing strategic partnerships, and conscious decisions to walk away from volumes at pricing terms not in LNTH's best interest."  As a result of these walk-aways and increased competition, however, "PYL vols grew 2% y/y and 4% q/q, implying a price/mix -10%."

51.     The fact that these analysts, and others, discussed Lantheus' shortfall and further reduced projections suggests the public placed significant weight on Lantheus' statements of prior confidence in their outlook and grasp on the pricing and competitive dynamics of the Pylarify's market. The frequent, in-depth discussion of Lantheus' guidance confirms that Defendants' statements during the Class Period were material.

*Loss Causation and Economic Loss*

52.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Lantheus' common stock and operated as a fraud or deceit on Class Period purchasers of Lantheus' common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Lantheus' common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Lantheus' common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

53.    Lantheus' stock price fell in response to the partial corrective event on May 7, 2025, as alleged *supra*. On May 7, 2025, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Lantheus' forecasting processes and growth guidance regarding Pylarify.

54.    In particular, on May 7, 2025, Lantheus announced significantly below-market sales for Pylarify and reduced their own prior guidance for the full fiscal year 2025 due to reduced expectations for Pylarify's sales growth.

55.    Lantheus' stock price again fell in response to the final corrective event on August 6, 2025, as alleged supra. On August 6, 2025, Defendants disclosed additional information that was directly related to their prior misrepresentations and material omissions concerning Lantheus' forecasting process and growth guidance regarding Pylarify both prior to and following the May 7, 2025, partial corrective event.

56.     In particular, on August 6, 2025, Lantheus again announced significantly below-market sales for Pylarify and reduced their own prior guidance for the full fiscal year 2025 for a second time in as many quarters, due to further reduced expectations for PYLAIFY's sales growth.

### Presumption of Reliance; Fraud-On-The-Market

57.     At all relevant times, the market for Lantheus' common stock was an efficient market for the following reasons, among others:

(a)     Lantheus' common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b)     Lantheus communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)     Lantheus was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about Lantheus was reflected in and incorporated into the Company's stock price during the Class Period.

58.     As a result of the foregoing, the market for Lantheus' common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Lantheus' stock price. Under these circumstances, all purchasers of Lantheus' common stock during the Class Period suffered similar injury through their purchase of Lantheus' common stock at artificially inflated prices, and a presumption of reliance applies.

59.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### *No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

60.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue growth projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in growth and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

61.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

62.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Lantheus who knew that the "forward-

looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

63.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Lantheus' securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

64.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Lantheus' common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Lantheus or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of August 1, 2025, there were 67.994 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if

not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

65.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

66.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

67.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Lantheus;

(c)    whether the Individual Defendants caused Lantheus to issue false and misleading financial statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)    whether the prices of Lantheus' common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

68.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

<u>**COUNT I**</u>

***Against All Defendants for Violations of***

<u>***Section 10(b) and Rule 10b-5 Promulgated Thereunder***</u>

69.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

70.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

71.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Lantheus common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Lantheus'

securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

72.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Lantheus' securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

73.     By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

74.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Lantheus' internal affairs.

75.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Lantheus' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Lantheus' common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Lantheus' common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

76.     During the Class Period, Lantheus' common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Lantheus' common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Lantheus' common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Lantheus' common stock

declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

77.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

78.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

79.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

80.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company business affairs. Because of their senior positions, they knew the adverse non-public information about Lantheus' misstatements.

81.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Lantheus which had become materially false or misleading.

82.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Lantheus disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Lantheus to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Lantheus' common stock.

83.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Lantheus to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

84.     By reason of the above conduct, the Individual Defendants and/or Lantheus are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.


Dated: September 9, 2025                          Respectfully submitted,

                                                 **LEVI & KORSINSKY, LLP**


                                                 */s/ Adam M. Apton*
                                                 Adam M. Apton
                                                 33 Whitehall Street, 27th Floor
                                                 New York, New York 10004
                                                 Tel.: (212) 363-7500
                                                 Fax: (212) 363-7171
                                                 Email: aapton@zlk.com

                                                 *Attorneys for Plaintiff*