UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | x | |
| In re LANTHEUS HOLDINGS, INC. | : | Master File No. 1:25-cv-07491-JHR-RWL |
| SECURITIES LITIGATION | : | |
| | x | CLASS ACTION |

DEMAND FOR JURY TRIAL

AMENDED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Lead Plaintiff Indiana Public Retirement System and plaintiff Sebastien Hazard allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation conducted by and through counsel, which included, among other things, a review of Lantheus Holdings, Inc.'s ("Lantheus" or the "Company") U.S. Securities and Exchange Commission ("SEC") filings, the Company's news releases and conference calls, analyst reports, media reports, market research, information provided by industry experts and industry participants, and other information about the Company, the radiopharmaceutical market, and Medicare drug pricing. Plaintiffs believe that substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1. This securities fraud class action arises from a calculated effort by Lantheus and its top executives to sustain the illusion that PYLARIFY, the Company's "blockbuster" prostate-specific membrane antigen positron emission tomography ("PSMA PET") imaging agent, was largely insulated from a seismic shift in Medicare reimbursement. While defendants repeatedly stated that the impending change in Medicare reimbursement affected only 20% of PYLARIFY patients, they were privately managing an across-the-board pricing power collapse that posed an existential threat to the Company's core revenue engine.

2. PYLARIFY is Lantheus' flagship product, accounting for 60-70% of the Company's total revenue over the last several years. As PYLARIFY's lucrative transitional pass-through ("TPT") reimbursement status granted by the Centers for Medicare & Medicaid Services ("CMS") neared its December 31, 2024, expiration, defendants assured investors that the transition

to Mean Unit Cost ("MUC") pricing would be minimal and manageable through "secured" contracts with strategic partners.

3. Contrary to their representations, the MUC rate was a benchmark for the entire market. The shift from average sales price ("ASP") based reimbursement to MUC slashed hospital payments by approximately 46%, turning PYLARIFY from a high-margin asset into a financial liability for healthcare providers. Defendants' assurances were hollow; while defendant Brian A. Markison (the Company's Chief Executive Officer) let it slip during the November 6, 2024 conference call that the PYLARIFY contracts don't "lock up anything," he quickly backtracked, declining to further "comment on the details in those partnerships" – omitting the fact that the contracts were effectively illusory. Far from the contained impact defendants repeatedly touted to investors, CMS data and defendants' internal records confirmed that the MUC rate triggered a race to the bottom, prompting customer renegotiations, expanded discounting, increased rebate concessions, and account attrition.

4. The truth began to reach the market in a series of disclosures starting on November 6, 2024, when Lantheus reported 3Q24 financial results and ascribed the first ever sequential decrease in PYLARIFY sales to supposedly seasonal dynamics while downplaying some price compression and confusing the market about whether the Company would grow or sustain PYLARIFY going forward, which caused the Company's stock price to decline approximately 21%.[1] On May 7, 2025, Lantheus reported its 1Q25 results showing a surprising year-over-year decline in PYLARIFY sales for the first time ever and reduced full-year guidance, citing MUC-

---

[1] Lantheus' fiscal quarters end on March 31, June 30, September 30, and December 31. Each fiscal quarter is abbreviated herein as 1Q24, 2Q24, etc. When referring to calendar years, the abbreviation CY24 is used.

related competitive disruption which caused the Company's stock price to fall approximately 23%. On August 6, 2025, Lantheus disclosed further year-over-year PYLARIFY declines, intensified competitive pricing, contract renegotiations, net price compression, and again reduced guidance, which caused Lantheus' stock price to fall nearly 29% in a single day. Subsequent disclosures in November 2025 reflected continued PYLARIFY sales declines, rising rebates and allowances, and additional market share pressure which caused the Company's stock price to decline over 11% over two days.

5. The collapse in Lantheus' stock price was punctuated by the sudden and suspicious exits of the Company's senior leadership: defendant Amanda M. Morgan's leave of absence for "personal reasons," followed by defendant Brian A. Markison and defendant Paul M. Blanchfield's abrupt departures. By the end of the Class Period (defined below), Lantheus' "blockbuster" PYLARIFY franchise was diminished, leaving investors to bear the losses.

6. This action seeks to recover damages under §10(b) and §20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and SEC Rule 10b-5 on behalf of investors who purchased Lantheus common stock between July 10, 2024 and August 5, 2025 (the "Class Period"), and were harmed when the market learned that PYLARIFY's pricing power and growth trajectory had been materially affected by the post-TPT reimbursement structure and related competitive dynamics, contrary to defendants' repeated false assurances of insulation, stability, and sustained growth.

## JURISDICTION AND VENUE

7. The claims asserted herein arise under and pursuant to §10(b) and §20(a) of the 1934 Act, 15 U.S.C. §78j(b) and §78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

9. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27 of the 1934 Act, 15 U.S.C. §78aa, because Lantheus common stock is listed and trades on The Nasdaq Global Market ("NASDAQ"). In addition, defendants' wrongful acts had a substantial effect in this District, where numerous investors purchased Lantheus securities.

10. In connection with the acts and conduct alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate wire and telephone communications, and the facilities of a national securities exchange.

## PARTIES

11. Lead Plaintiff Indiana Public Retirement System purchased Lantheus common stock at artificially inflated prices during the Class Period and suffered damages as a result of defendants' alleged misconduct, as set forth in the certification submitted herewith.

12. Plaintiff Sebastien Hazard purchased Lantheus common stock at artificially inflated prices during the Class Period and suffered damages as a result of defendants' alleged misconduct, as set forth in the certification previously filed as ECF 11-1 and incorporated by reference herein.

13. Defendant Lantheus' common stock is listed and actively traded on the NASDAQ under the ticker symbol LNTH. As of February 26, 2025, there were over 68.4 million shares of Lantheus common stock outstanding.

14. Defendant Brian A. Markison served as Lantheus' CEO from March 1, 2024, and had been a member of its Board of Directors since 2012, until his "retirement" effective December 31, 2025. When introduced as Lantheus' new CEO, Markison was described as having "40 years

of healthcare experience, including executive roles" at several corporations with "a steadfast focus throughout his career on oncology, virology, and diagnostics, leading the successful commercial introduction of numerous therapeutics" and as "an experienced executive who intimately understands Lantheus, our strategy and our industry." During his first conference call as CEO, Markison said he has "a deep understanding of Lantheus and the radiopharmaceutical industry." As CEO, Markison spoke on Lantheus' behalf in news releases, conference calls, and SEC filings during the Class Period. Pursuant to §906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. §1350, Markison certified the accuracy of Lantheus' periodic reports filed with the SEC, including the Company's Forms 10-K and 10-Q issued during the Class Period.

15. Defendant Paul M. Blanchfield served as Lantheus' President throughout the Class Period and oversaw "all aspects of Commercial, Technical Operations & Manufacturing and Quality." Blanchfield regularly participated in investor communications, earnings calls, and news releases concerning PYLARIFY's performance and the Company's revenue guidance. When Blanchfield was promoted to President in March 2023, then-CEO Mary Anne Heino said he "'was instrumental in the successful launch of the company's PSMA PET imaging agent for prostate cancer and has demonstrated strong leadership, a deep understanding of our industry, and a commitment to excellence.'" During several quarterly conference calls with investors and analysts, Blanchfield reiterated that "we're fiercely focused on defending, growing and continuing to ensure PYLARIFY remains the market leader going forward."

16. Defendant Robert J. Marshall, Jr. served as Lantheus' Chief Financial Officer and Treasurer throughout the Class Period. In that role, Marshall was responsible for Lantheus' financial reporting, internal controls, and public guidance. Marshall participated in the preparation

and dissemination of the Company's financial statements and other public filings with the SEC and certified the accuracy of those filings pursuant to the Sarbanes-Oxley Act of 2002.

17. Defendant Amanda M. Morgan served as Lantheus' Chief Commercial Officer during the Class Period and was responsible for leading the Company's commercial strategy and activities, including sales, marketing, market access, commercial operations, and customer experience. In announcing her promotion to that role in February 2024, Blanchfield noted she "'led our commercial efforts to grow the PSMA PET imaging market and solidify PYLARIFY as the agent of choice in an increasingly competitive market.'" He further noted that "'[s]he has also worked effectively to lead our annual business planning process and ensure we have the focus, talent, and culture to remain the leading radiopharmaceutical-focused company.'" Morgan was described as having 20 years of experience in the healthcare industry and as being "a seasoned commercial leader." Morgan spoke to investors and analysts on earnings calls and in presentations during the Class Period.

18. Defendants Markison, Blanchfield, Marshall, and Morgan are sometimes collectively referred to herein as the "Individual Defendants."

(a) During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Lantheus, were privy to confidential and proprietary, non-public information concerning Lantheus' operations and possessed the power and authority to, and did control the contents of the Company's public statements, including quarterly and annual reports, news releases, and presentations to securities analysts and investors. They either made or received the Company's statements alleged herein to be misleading before or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions within Lantheus, personal participation in the fraud as detailed herein,

communications with other corporate officers and employees, including their attendance at management and Board of Directors meetings, and their access to material non-public information available to them but not to the public, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

(b) As senior executive officers and/or directors of a publicly traded company whose stock was, and is, registered with the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Lantheus' operations, business, products, management, and earnings, and to correct any previously issued statements that had been materially misleading or untrue, so that the market price of Lantheus stock would be based upon truthful and accurate information. The Individual Defendants' omissions during the Class Period violated these requirements and obligations.

## BACKGROUND TO THE CLASS PERIOD

19. Prostate cancer is one of the most commonly diagnosed cancers among men in the United States, and the majority of diagnoses occur in men over age 65, many of whom are covered by Medicare, which is administered by CMS.

### Lantheus and the Central Importance of PYLARIFY

20. PYLARIFY is a radioactive diagnostic agent approved by the U.S. Food and Drug Administration ("FDA") in May 2021 that is used in the detection and management of prostate cancer.

21. PYLARIFY is by far the most significant product in Lantheus' portfolio. Between 2023 and 2025, PYLARIFY consistently generated approximately 60-70% of the Company's total

quarterly revenue. In 2024, PYLARIFY exceeded $1 billion in annual sales, becoming what the Company described as a "blockbuster" radiodiagnostic.

22. Because PYLARIFY represented the majority of Lantheus' revenue, changes affecting its reimbursement, pricing, utilization, or competitive position would have a material impact on the Company's financial performance and growth trajectory.

23. By early 2024, Lantheus was estimated to have held approximately 63% of the PSMA PET imaging market by volume.[2] The Company repeatedly emphasized PYLARIFY's market leadership, commercial reach, and growth potential in public statements to investors.

**TPT Status and Medicare Reimbursement**

24. From January 1, 2022 through December 31, 2024, PYLARIFY benefited from TPT status in the hospital outpatient setting.[3] Under TPT, Medicare separately reimbursed hospitals for qualifying drugs based on ASP plus 6%. This payment was separate from and in addition to the reimbursement for the PET procedure itself.

25. During the TPT payment period, the separate ASP plus 6% reimbursement structure provided hospitals with a favorable margin profile when using PYLARIFY:

---

[2] A PSMA PET scan is a type of imaging test that uses a radioactive tracer to detect prostate cancer by targeting a specific protein found on prostate cancer cells.

[3] Although PYLARIFY was the first widely available PSMA PET imaging agent, the following competitors obtained TPT status extending beyond PYLARIFY's TPT expiration: (a) Tellix's Illuccix, a Gallium PSMA PET imaging agent, obtained CMS TPT status for July 1, 2022 through June 30, 2025; (b) Novartis's Locametz, also Gallium based, obtained CMS TPT status for October 1, 2022 through September 30, 2025; and (c) Blue Earth Diagnostics' Posluma, an F-18 PSMA PET imaging agent, obtained CMS TPT status for October 1, 2023 to September 30, 2026.

| COMPONENT | LANTHEUS PYLARIFY | TELIX ILLUCCIX | NOVARTIS LOCAMETZ | BRACCO POSLUMA |
|---|---|---|---|---|
| CALENDAR YEAR 2024 – TPT PAYMENTS INCLUDED | | | | |
| **Payment** | **$7,326** | **$6,561** | **$6,630** | **$6,705** |
| *Drug* | *$5,834* | *$5,069* | *$5,138* | *$5,213* |
| *PET Scan* | *$1,492* | *$1,492* | *$1,492* | *$1,492* |
| **Costs** | **$4,522** | **$4,076** | **$4,007** | **$4,127** |
| *Drug* | *$3,224* | *$2,778* | *$2,709* | *$2,829* |
| *PET Scan* | *$1,298* | *$1,298* | *$1,298* | *$1,298* |
| **Margin ($)** | **$2,804** | **$2,486** | **$2,624** | **$2,579** |
| **Margin (%)** | **62%** | **61%** | **65%** | **62%** |

26. Once TPT status expires, CMS had historically "packaged" or bundled diagnostics into the procedure payment, meaning hospitals receive no separate reimbursement for the diagnostic product itself. Under a bundled framework, hospitals are paid a fixed amount for the overall procedure (~$1,300), regardless of the radiopharmaceutical product's acquisition cost (~$3,224 for PYLARIFY in CY24), which causes provider margins to turn deeply negative and creates a substantial financial disincentive for providers to choose more lucrative PSMA PET products.

27. As the expiration of PYLARIFY's TPT payment status expiration date approached, Lantheus actively lobbied CMS to: (a) adopt a rule providing separate payment for diagnostic radiopharmaceuticals like PYLARIFY; and (b) use the ASP methodology to establish the separate payment level in CY25. Lantheus also supported Congressional efforts to enact legislation that would "rescind what is currently defined [a]s pass-through and not have a period that we have now."

28. The March 2021 Government Accountability Office ("GAO") report on Medicare Part B payments, cited by Lantheus in its September 8, 2023 letter to CMS, explained that "[o]ur analysis of Medicare payment data showed that, for six of the seven selected drugs, the total payment associated with the drug and procedure decreased when the drug's pass-through payments

expired and it was packaged." The GAO further acknowledged that hospitals' use of certain high-cost drugs decreased after TPT ended.

29. In July 2023, CMS issued a proposed rule (CMS-1786-P) and sought comments from stakeholders regarding, among other things, the packaging (or bundling) of diagnostic radiopharmaceuticals after TPT expired. On September 8, 2023, Lantheus corresponded with CMS about that proposed rule, stating, in relevant part, as follows:

> As previously discussed, the [Outpatient Prospective Payment rule] has limitations in its ability to adequately reimburse for high-cost diagnostic radiopharmaceuticals. This limitation has led to tangible patient care and patient access issues. For example, [the Society of Nuclear Medicine and Molecular Imaging] has presented data demonstrating that a subset of hospitals has stopped performing certain clinically appropriate procedures that use diagnostic radiopharmaceuticals due to the inadequacy of the payment rate. Furthermore, an independent survey of 300 nuclear medicine providers found that the payment rate for diagnostic radiopharmaceuticals impacted their clinical decision-making on which study to perform. The consequences of the packaging policy are especially profound for Medicare patients with cancer and neurodegenerative diseases since there are currently substantial payment differences. In other words, the current reimbursement for these imaging services may only cover a small portion of the cost of the radiopharmaceutical that a physician may have otherwise selected based on the clinical appropriateness for the patient. Therefore, this packaging policy serves as a barrier, or at a minimum a financial disincentive, to patient's access to the most clinically appropriate care. In fact, a 2021 report from the General Accounting Office on this issue acknowledged that hospitals' use of precision diagnostic radiopharmaceuticals decreased when the pass-through payment ended, and the packaging began.

**The Looming Expiration of TPT Payment Status**

30. Defendants repeatedly acknowledged that PYLARIFY's TPT payment status would expire on December 31, 2024. And since at least June 2023, Lantheus executives had been consistently telling investors that: they were "fiercely focused" on PYLARIFY; the Company was prepared for the expiration of PYLARIFY's TPT payment status; the impact would be limited to approximately 20% of PYLARIFY revenue; and they had implemented strategies to mitigate any resulting impact. For example:

(a) On August 3, 2023, defendant Blanchfield stated that "we have a multipronged strategy, both through CMS and through the FIND Act as well as other commercial strategies to minimize the potential impact on pass-through."

(b) On January 10, 2024, then-CEO Heino stated: "I can assure you, as a company, we are strategically prepared to manage a market post that date in which we don't have pass-through status."

(c) On May 2, 2024, defendant Blanchfield reiterated: "We continue to actively implement a multifaceted strategy to mitigate the impact of the potential expiry of transitional pass-through payment, or TPT, at the end of 2024. It's important to note that potential expiration of TPT only affects approximately 20% of our PYLARIFY revenue, and we are committed to mitigating the impact for hospitals. . . . [W]e continue to be incredibly confident with PYLARIFY's leadership position, even amidst the potential expiry of pass-through at the end of this year."

(d) That same day, defendant Markison added that: "[W]e have a very strong sense of what the future looks like for PYLARIFY. And I'm going to let Paul elaborate, but our strategic agreements with our customers are multiyear in duration. They've all been in the works for quite some time, and the preparation for this has been, like I said, well underway for a while."

31. Lantheus executives also sought to assure investors that "we do continue to enter into long-term strategic partnerships with select customers to ensure they have access to and preferably choose PYLARIFY." They further emphasized that "we are fiercely focused on this. We talk about it on a daily basis, and we are focused on ensuring that PYLARIFY continues to grow, remains the market leader and is available for patients." They further explained that "we have an incredibly experienced commercial team, I think, which includes market access, national

accounts and overall sales team that is very well experienced in working with commercial customers that we know deeply and have built long-term relationships over the last number of years." They also explained that "each quarter, we evaluate or reevaluate to confirm or dismiss our assumptions."

32. Lantheus regularly told investors that PYLARIFY would hit blockbuster status in 2024.[4] And the Individual Defendants' personal financial incentives were heavily weighted toward attaining blockbuster status in the lead-up to PYLARIFY losing its TPT payment status:

| **Metric** | **Weight** | **2024 Outcome** | **Impact on Bonus** |
|---|---|---|---|
| **Net Revenue** | 40% | \$1.533B (vs \$1.46B target) | 123% Payout |
| **Bonus EPS** | 30% | \$6.17 (vs \$5.91 target) | 115% Payout |
| **Strategic Goals** | 30% | "Exceeded" (PSMA growth) | 118% Payout |
| **Stock (PSUs)** | - | 100th Percentile TSR | 200% Payout |

33. Against this backdrop – where PYLARIFY generated the majority of Lantheus' revenue, the expiration of TPT status was known and anticipated, and defendants had repeatedly represented that the Company was strategically prepared and that the impact would be limited – the Class Period begins.

**DEFENDANTS' FALSE AND MISLEADING NARRATIVE**
**JULY 10, 2024 – AUGUST 5, 2025**

34. Lantheus experienced a significant stock price increase between July 9 and 10, 2024, the same day the CMS proposed rule change for CY25 was announced, indicating that CMS would establish separate payment for specialized diagnostic radiopharmaceuticals with daily costs above \$630, including PYLARIFY, rather than packaging them into the procedure cost. CMS'

4 Blockbuster status generally indicates annual sales of \$1 billion or more.

proposed rule also indicated that the reimbursement payment for PYLARIFY would change from ASP to the significantly lower MUC.

35. On July 10, 2024, Lantheus issued a news release "welcom[ing]" CMS' proposed CY25 rule for certain specialized diagnostic radiopharmaceuticals, including PYLARIFY, following the expiration of its TPT status on December 31, 2024. The Company described the proposal as implementing "***improved payment***" mechanisms "to support patient access for Medicare beneficiaries." The release explained that: "In the proposed rule, innovative diagnostic radiopharmaceuticals, including PYLARIFY, ***would continue to be paid separately*** by CMS for traditional Medicare Fee for Service patients in the hospital outpatient setting following the expiry of traditional pass-through payment status." Defendant Markison stated: "'We are pleased that the proposed rules recognize the value of diagnostic radiopharmaceuticals, including PYLARIFY, and the need to change the current payment system.'"

36. The ***statements*** in ¶35 were materially misleading because, while CMS' proposal literally provided a separate payment for PYLARIFY, it proposed replacing ASP-based reimbursement with an MUC methodology that defendants knew would materially alter the reimbursement economics in the hospital outpatient setting. By emphasizing the "continu[ation]" of separate payment and describing the proposal as implementing "improved payment" mechanisms, Lantheus and Markison conveyed a misleading impression of reimbursement stability and continuity, while omitting that the proposed shift to MUC pricing would significantly reduce hospital reimbursement relative to the TPT payment period and relative to competitors that retained TPT payment status beyond December 31, 2024.

37. On July 31, 2024, Lantheus reported its 2Q24 financial results, with PYLARIFY generating $273.3 million in revenue, which comprised approximately 70% of the Company's

2Q24 revenue, and represented 29.8% year-over-year growth. That same day, in a Form 8-K filed with the SEC, Lantheus stated that under the proposed CMS rule, PYLARIFY "would ***continue to be paid separately*** by CMS for traditional Medicare Fee for Service patients in the hospital outpatient setting following the expiry of traditional pass-through payment status."

38. The 2Q24 Form 10-Q signed by defendants Markison and Marshall and filed with the SEC that same day stated that "[i]f implemented in the final rule in November, CMS would ***maintain separate payment*** for PYLARIFY after the expiration of TPT Status ***for the approximately 20% of patients with traditional Medicare fee-for-service insurance coverage who are treated in the hospital outpatient setting***." The Form 10-Q also included risk factors, including the following (two of which, (a) and (b), were unchanged from the Company's February 2024 Form 10-K):

(a) "[W]e can give no assurances that . . . the availability of TPT Status for other diagnostic radiopharmaceuticals will not impact clinical decision making regarding which product to use [for all patient populations], which ***could*** have an adverse effect on our business, results of operations, financial condition and cash flows."

(b) "If Medicare and other third party payors do not provide adequate reimbursement for the costs of our products (or services provided [by healthcare providers] using our products), deny the coverage of the products (or those services), or reduce current levels of reimbursement, healthcare professionals ***may not*** prescribe our products and providers and suppliers may not purchase our products."

(c) "Other competitive PSMA PET imaging agents will continue to have TPT after December 31, 2024 which ***could*** result in PYLARIFY customers choosing to prescribe and use a competitor's PSMA PET imaging agent instead of PYLARIFY."

(d) If Lantheus "lose[s] market share to existing or future competitors (including during any period of time in which our TPT Status has expired but TPT Status for a later-approved competitive products still exists), such loss of market share ***could*** have an adverse impact on our business, results of operations, financial condition and cash flows."

39. Later that same day, Lantheus executives hosted a conference call during which defendant Blanchfield stated:

(a) "If implemented as a final rule in November, CMS would ***maintain separate payment*** for PYLARIFY ***for the approximately 20% of patients*** with traditional Medicare fee-for-service insurance coverage who are treated in the hospital outpatient setting. In addition to the PET/CT procedural payment. In the proposed rule separate payment would be based on mean unit cost or MUC, beginning in 2025 . . . ."

(b) Responding to an analyst's question about strategic partnership contracts, Blanchfield said, "***[s]trategic partnerships, as mentioned in the prepared remarks, remain a core part of our multifaceted strategy to sustain PYLARIFY*** clear position as the number one PSMA PET imaging agent. We view these partnerships with key customers that incredibly beneficial to ensure that PYLARIFY remains that PSMA PET agent of choice and accessible to all patients even amidst three other competitors in the market. ***Conversations with these key customers continue to go well and we are pleased with our progress***."

(c) In response to an analyst's question whether Lantheus was "in a better bargaining position" in its discounting and contracting discussions following the CMS proposal, defendant Markison stated, "[t]he answer to your last question is no comment, but ***we're very encouraged by what we're seeing***."

(d) Responding to an analyst's question, "can you grow PYLARIFY next year[,]" Blanchfield said, "suffice it to say a product that's been growing 30% in the first half of this year, 30% year over year with our guide to be in the mid-20%. We still have some ample room and momentum to continue to grow into lead and the recent CMS proposed rules only further support that story in addition to the commercial differentiation, the continued lifecycle management. And so ***we remain very positive on PYLARIFY near and long-term growth potential***."

40. During that same conference call, an analyst asked whether competitors were "doing anything meaningful" or making inroads in the PSMA PET market. Defendant Markison responded: "***Yeah, no . . . . As far as our commercial game plan, nothing changes***. We're committed to our strategic partnerships. We're committed to bringing the best product to more people. ***So nothing changes. As far as competition is concerned, look, we monitor it, we're aware of it***." Defendant Morgan added, "[s]o from a competitive dynamic perspective, PYLARIFY is the clear market leader in PSMA PET imaging," and "***[w]e've seen our market leadership continue to expand and solidify with our absolute annual revenue growth outpacing that of what we see with our competitors***."

41. The ***statements*** in ¶¶37-40 were materially misleading for the reasons stated in ¶36 and because by emphasizing the "continu[ation]" of separate payment, characterizing the exposure as limited to approximately 20% of PYLARIFY revenue, and assuring investors that competitive dynamics and strategic partnerships remained stable, defendants Lantheus, Markison, and Blanchfield conveyed a misleading impression of reimbursement containment and pricing stability. At the time these statements were made, defendants had access to and/or reviewed Lantheus' internal sales and financial reporting systems that tracked PYLARIFY orders, pricing,

rebates, and account-level performance on at least a weekly and monthly basis. PYLARIFY customers could enter orders in a WebOLO software system and Lantheus employees could view the orders in real time on the Lisbon software platform. PYLARIFY sales and contract personnel provided real-time updates to document their client interactions in the Company's Salesforce Veeva dashboards. PYLARIFY order, volume, and pricing data were used to create weekly reports on the Power BI data visualization platform, which reported PYLARIFY's performance as compared to the forecast. Lantheus accounting directors maintained weekly revenue dashboards that provided actionable insights into performance relative to historical trends and expectations. Power BI dashboards and Excel spreadsheets housed in SharePoint tracking PYLARIFY performance, including volume, pricing, sales, and site-level performance, were available to and used by several senior executives, including defendants Blanchfield and Morgan. Weekly recap reports showing PYLARIFY's weekly performance versus the forecast went to approximately 30 individuals across the Company. PYLARIFY sales personnel also attended monthly national sales calls with the PYLARIFY team and defendant Morgan and at least one of her deputies, Seth Corcoran, in addition to quarterly companywide meetings led by defendants Markison, Blanchfield, and Morgan, as well as managers, regarding PYLARIFY sales. Despite the availability of contemporaneous information to defendants, the Company's risk disclosures continued to frame reimbursement-related impacts as potential future risks rather than known trends already affecting pricing and customer negotiations. In addition, defendants knew, or recklessly disregarded, the following material facts:

(a) While defendants characterized the impact of MUC reimbursement as affecting only approximately 20% of patients – those covered by traditional Medicare Fee for

Service ("FFS") in the hospital outpatient setting – they omitted that the MUC rate functioned as a benchmark for the other 80% of patients.

(b) As Lantheus acknowledged in prior CMS correspondence, which cited the 2021 GAO report, hospital utilization of high-cost diagnostic radiopharmaceuticals has historically declined following the expiration of pass-through payment. When competing products retained TPT status and ASP-based reimbursement, those products enjoyed a relative reimbursement advantage. Under the MUC framework, when reimbursement fell below hospital acquisition costs, customers sought pricing concessions or evaluated alternative agents.

(c) Despite publicly representing that the Company was "strategically prepared to manage a market post . . . pass-through status," defendants had not yet applied for a New Drug Application ("NDA") for PYLARIFY's successor formulation which would qualify for renewed pass-through eligibility, leaving PYLARIFY subject to the MUC reimbursement structure from January 1, 2025 through at least May 2025 and likely much later, depending on when the NDA was eventually filed.[5]

(d) Although defendants repeatedly represented that multi-year strategic partnership contracts helped secure customer relationships and support price and volume stability, the contracts did not require exclusivity and permitted customers to purchase competing agents.

---

[5] On March 6, 2026, Lantheus announced that PYLARIFY's successor formulation will be named PYLARIFY TruVu. Lantheus itself did not submit the PYLARIFY TruVu NDA; it's wholly owned subsidiary, Aphelion LLC, did. Aphelion LLC was established on July 8, 2024 in Delaware. It was not disclosed as a Lantheus affiliate until the filing of the February 26, 2025, Form 10-K. PYLARIFY TruVu is a trademark owned by Progenics Pharmaceuticals, Inc., another Lantheus subsidiary. The trademark was filed on February 26, 2025. Based on these facts and PYLARIFY TruVu's Prescription Drug User Fee Act ("PDUFA") date of March 6, 2026, the NDA for PYLARIFY TruVu was likely submitted between late March and early April 2025. (The FDA takes up to 60 days after submission to accept a filing. Under standard review, the FDA has ten months from the filing date to make a decision on an NDA pursuant to the PDUFA.)

42. A July 31, 2024, Jefferies Research report acknowledged the significance of the CMS reimbursement update, but showed that the analyst believed the Company's spin, noting that while "the initial separate payment for PYLARIFY could be based on MUC vs. ASP," the Company continued to believe that "PYLARIFY can grow strongly in '25 given a large under penetrated market that is growing nicely and with LNTH maintaining share." The Jefferies report further stated that "[w]hile the MUC issue could create noise, lower than peer reimbursement would be limited to Medicare outpatient (20% of vols) in a worst case and LNTH continues to enter long-term strategic partnerships with key customers." The report also observed that "LNTH continues to see the bulk of PET imaging split about 60% hospital, 35% freestanding imaging centers, and 5% govt with about 20% in Medicare OP exposed to TPT," and that PYLARIFY "continues to hold mid 60% market share, which has been stable."

43. On September 4, 2024, defendant Markison spoke at the Morgan Stanley Global Healthcare Conference and responded to an analyst's question regarding the "implications" of "the reimbursement situation" and the "potential impact to patients." Markison stated, among other things, "***[s]o whether they reimburse that average selling price or M[U]C, both are a win for us. It's going to reduce our cost of doing business dramatically***." The analyst also asked Markison to elaborate on the "breadth of the contracting that you do with your customers" and what that meant for pricing and the Company's long-term outlook. Markison responded:

> Well, we have a long tradition of partnering with our customers. And this is basically a playbook right out of DEFINITY [Lantheus' other primary product], where ***we'll get into multiyear agreements with our top customers, and we'll reward them for growth in volume and loyalty to staying with us***. So it's really straightforward. And there's a portfolio play with us, that's really important. And also the ability for us to deliver and have great service is really important.
>
> So when customers want the doses, they get the doses, no matter where they are, for the most part, and they stay with us for multiple years. So it's a pretty strong relationship where we live in nuclear medicine.

44. The ***statements*** in ¶43 were materially misleading for the reasons alleged in ¶¶36 and 41, and for the additional reason that by August 2024, CMS utilization data reflected a decline in hospital outpatient use of PYLARIFY as the expiration of TPT status approached, consistent with the reimbursement-driven utilization patterns in the 2021 GAO report that Lantheus previously acknowledged and described in its letter to CMS. At the same time, as described in ¶41, the Company's internal sales and financial reporting available to and/or reviewed by Markison reflected increasing price compression in customer agreements associated with the anticipated shift to MUC reimbursement.

45. On September 6, 2024, Lantheus submitted a letter to CMS commenting on the CY25 Hospital Outpatient Prospective Payment ("OPPS") and Ambulatory Surgical Center Payment Systems Proposed Rule ("CMS-1809-P"), which stated, in part, that:

> In our prior comments to the CY 2024 OPPS Proposed Rule, we addressed how the current packaging policy serves as a barrier, or at a minimum a financial disincentive, to beneficiaries receiving the most clinically appropriate care. In 2021, the General Accounting Office reported on this issue and acknowledged that hospitals' use of precision diagnostic radiopharmaceuticals decreased when the pass-through payment ended, and the packaging began.
>
> * * *
>
> Lantheus supports CMS's proposal to separately pay for diagnostic radiopharmaceuticals exceeding the specified cost threshold. We also recommend refinements to the proposal to reimburse on the basis of MUC. MUC is a reasonable approach for some diagnostic radiopharmaceuticals; however, where reported, ASP should be used as the basis for payment in CY 2025, particularly for those products coming off transitional pass-through payment that have been paid based on ASP.[6]

46. An October 20, 2024, Jefferies equity research report noted that "[o]ur channel checks point to sustained strong mkt growth for PSMA PET with significant mkt expansion

---

[6] In the letter, Lantheus also noted that it has "shared data recently with CMS's OPPS staff regarding PYLARIFY."

oppys . . . . LNTH's Pylarify is preferred by many metropolitan centers we have interviewed, given its wide availability, image clarity, turnaround times and first mover advantages, and for TLX Illuccix feedback has also been positive. Most physicians see both products as clinically interchangeable and tend to choose based on availability, contracting, and other factors."

47. CMS' 2025 OPPS Final Rule (CMS 1809-FC) was publicly released on November 1, 2024, and formally published in the Federal Register thereafter (89 Fed. Reg. 93912 (November 27, 2024)). The Cost Statistics File and Addendum B, which list the final payment rates for all outpatient codes (including the radiopharmaceutical code A9595 – Piflufolastat F-18 (PYLARIFY)), were posted on CMS' website. There was an apparent inconsistency between the final payment rates for PYLARIFY in the Cost Statistics File (MUC rate of $332.44 and final payment rate of $580.30) and Addendum B (final payment rate of $615.116). The MUC rate was approximately 46% less than PYLARIFY's ASP rate.

48. On November 4, 2024, Lantheus issued a news release "applaud[ing]" CMS' final CY25 OPPS rule, which the Company noted was available on the CMS website. The release stated that PYLARIFY would "now be 'unbundled'" and reiterated that PYLARIFY will "***continue to be paid separately*** by CMS for traditional Medicare Fee for Service (FFS) patients in the hospital outpatient setting following the expiry of pass-through payment status."

49. On November 6, 2024, Lantheus issued a news release announcing its 3Q24 financial results, reporting that PYLARIFY generated $259.8 million in revenue, an increase of 20.6% year-over-year, and comprised 68.6% of the Company's total quarterly revenue. Despite these results, this was the first time in 14 consecutive quarters that PYLARIFY sales did not grow sequentially. Nonetheless, the release stated that PYLARIFY "***[g]rowth was driven by increasing volumes at existing accounts with a slight net price offset as we secured strategic partnerships***."

The release also stated that CMS had released its final CY25 OPPS rule "***which included improved payment*** for specialized diagnostic radiopharmaceuticals to support patient access for Medicare fee-for-service (FFS) beneficiaries." Defendant Markison was quoted as saying, "'***PYLARIFY is on track to exceed $1 billion in sales in 2024 and maintain its market leadership and blockbuster status in 2025***.'"

50. The 3Q24 Form 10-Q signed by defendants Markison and Marshall and filed with the SEC that same day stated that the "calendar year 2025 payment rate for PYLARIFY is listed in Addendum B of the final rule and ***is equal to the current PYLARIFY payment rate***." The Form 10-Q also disclosed that rebates and allowances had ballooned from $26.4 million in 2Q24 to $42.7 million in 3Q24, with payments made during the period likewise increasing from $25.3 million to $36.9 million. The 3Q24 Form 10-Q repeated without change the same warnings from the prior quarter that:

(a) "[W]e can give no assurances that . . . the availability of TPT Status for other diagnostic radiopharmaceuticals will not impact clinical decision making regarding which product to use, which ***could*** have an adverse effect on our business, results of operations, financial condition and cash flows."

(b) "If Medicare and other third party payors do not provide adequate reimbursement for the costs of our products (or services provided [by healthcare providers] using our products), deny the coverage of the products (or those services), or reduce current levels of reimbursement, healthcare professionals ***may not*** prescribe our products and providers and suppliers may not purchase our products."

(c) "Other competitive PSMA PET imaging agents will continue to have TPT after December 31, 2024 which ***could*** result in PYLARIFY customers choosing to prescribe and use a competitor's PSMA PET imaging agent instead of PYLARIFY."

(d) If Lantheus "lose[s] market share to existing or future competitors (including during any period of time in which our TPT Status has expired but TPT Status for a later-approved competitive products still exists), such loss of market share ***could*** have an adverse impact on our business, results of operations, financial condition and cash flows."

51. During Lantheus' 3Q24 earnings call that same day, defendant Blanchfield stated:

(a) Lantheus was "well positioned to continue as the clear market leader in PSMA PET imaging and ***sustain PYLARIFY as $1 billion franchise in 2025***."

(b) "***CMS will maintain separate payment for PYLARIFY*** for the approximately 20% of patients with traditional Medicare fee-for-service insurance coverage who are treated in the hospital outpatient setting."

(c) "PYLARIFY's calendar year 2025 payment rate is found in Addendum B and ***is the same as its current payment rate***."

(d) "[W]hat we saw coming out of CMS on Friday is that the final 2025 calendar year payment rate for PYLARIFY ***very much matches and is effectively the same as its existing payment rate*** for Medicare fee-for-service patients in the hospital outpatient setting. And so ***what that really does is sustain PYLARIFY payment*** in that for 2025."

52. During that same earnings call, a Jefferies analyst asked, "[j]ust as a follow-up, I wanted to see if we could pin down on the final addendum there. The unit price is $650. Is that the price that you understand you're going to get now?" Defendant Blanchfield responded, "***you're reading Addendum B correctly on the proposed price***. . . . It's not to say that CMS does

not reserve the right to make adjustments, but we feel confident that PYLARIFY is going to be paid appropriately in 2025 and that if an issue at all, it's a far smaller issue than we were, say, at the beginning of the year before CMS came out with these rules to recognize the value that innovative radiopharmaceuticals come out with."

53. During the same earnings call, defendant Blanchfield stated that although "***the overwhelming majority of our accounts did grow on an absolute basis in line with the broader market***," the "sequential revenue decline was ***driven by traditional third-quarter seasonality, the net price impact of our recently secured strategic partnerships, as well as intentional tradeoffs largely due to product availability***." Blanchfield further explained that "we did make some intentional tradeoffs, largely due to product availability, and ***there were a handful accounts we chose not to match a lower price from the competition***, where price at these transactional customers was more important than quality." Blanchfield also emphasized that "***[w]e continue to secure strategic partnerships with hospitals and freestanding imaging centers*** and believe ***our ability to maintain a price premium versus that of our competition reflects the commercial and clinical value that PYLARIFY provides to our customers***" and that "***we are incredibly well positioned*** to grow revenue sequentially in the fourth quarter and ***to sustain $1 billion franchise for PYLARIFY going forward***." Defendant Markison added, "***[w]e do anticipate PYLARIFY growth next year. We're referring to volume growth specifically***."

54. The ***statements*** in ¶¶48-53 were materially misleading for the reasons alleged in ¶¶36, 41, and 44, and because defendants knew, or recklessly disregarded, the following material facts:

(a) While defendants repeatedly stated that PYLARIFY's 2025 payment rate was "the same as" or "effectively the same as" its current payment rate and confirmed that analysts

were "reading Addendum B correctly," defendants Lantheus, Markison, and Blanchfield were aware of and disregarded contemporaneous CMS data in the Cost Statistics File that reflected a 46% lower reimbursement outcome under the MUC methodology. By emphasizing Addendum B without addressing the lower MUC rate reflected in the Cost Statistics File, defendants conveyed a misleading impression of reimbursement continuity.

(b) Although defendants repeatedly represented that multi-year strategic partnership contracts helped secure customer relationships and support price and volume stability, the "contracts" were actually pricing agreements that did not require exclusivity and lacked meaningful penalty or enforcement provisions. While defendant Markison let it slip during the November 6, 2024 conference call that the contracts didn't "lock up anything," he quickly backtracked, declining to further "comment on the details in those partnerships" – omitting the fact that the contracts were effectively illusory and the percentage of Lantheus' PYLARIFY business purportedly "secured" by the contracts was overstated. Notwithstanding the limited nature of these contracts, defendants cited such partnerships as evidence of revenue stability and growth visibility.

(c) The 3Q24 Form 10-Q repeated risk disclosures warning that reimbursement changes or competitive TPT advantages "could" adversely affect utilization and market share. At the time of these statements, however, the Company's internal reporting reflected increasing rebate provisions, pricing concessions, and lost accounts consistent with emerging reimbursement-driven price compression. The risk factors did not disclose that such dynamics were already affecting PYLARIFY sales and market share.

(d) After "walking away" from business and seeing volume decline and its market begin to erode, as early as 3Q24, Lantheus changed course, authorizing the PYLARIFY

team to begin offering discounts, initially below 10% and eventually of up to 30% tied to share of practice targets within large accounts, and volume-based rebates ranging between 10-40%, which were approved by defendant Morgan's deputies (Sturgill and Curran).

(e) Lantheus tracked PYLARIFY performance, including volume, pricing, sales, and site-level performance, on a weekly basis. *See supra* ¶41. The weekly and monthly performance reports did not merely track internal sales trends; they showed PYLARIFY's performance versus the forecast and public guidance. Commercial, finance, contracting, and forecasting personnel met weekly to review snapshot reports – an Excel document owned by the head of forecasting and housed in the commercial group's SharePoint. The snapshot showed how Lantheus was performing against the forecast and from a guidance perspective. By 3Q24, reports reflected increasing rebate provisions and pricing concessions, as well as an increase in the loss of scanning sites using PYLARIFY, consistent with emerging price compression associated with the anticipated shift to MUC reimbursement.

55. Despite defendants' positive misstatements about PYLARIFY's growth, favorable CMS pricing, and status of strategic contracts, combined with their announcement of a $250 million share repurchase program designed to prop up the Company's share price, Lantheus' stock price declined approximately 20% on November 6, 2024 with analysts ascribing the cause of the stock price decline to decelerating sequential PYLARIFY sales growth and defendants' conflicting statements regarding growing versus sustaining PYLARIFY going forward.

(a) On November 6, 2024, TD Cowen issued a report on Lantheus, repeating defendants' talking points and stating that "[m]anagement attributed the slight decrease in Pylarify Q/Q revenue to summer seasonality, net price impacts from recent long-term strategic partnerships, and intentional trade-offs related to product availability." The report further noted

that "[n]et price compression is expected to normalize starting in H1:2025" and that "[u]pdated CMS pricing will be MUC-based and go into effect upon January 1st, 2025 and will only impact Medicare Fee for Service patients, which account for ~20% of the prostate cancer market." The report also reiterated that "Lantheus stated that the calendar year 2025 payment rate for Pylarify is the same as the current payment rate."

(b) Jefferies issued a report that same day also repeating defendants' talking points and reiterating that "LNTH noted the PYL CY25 CMS payment rate is found in Addendum B and is the same as its current payment rate." The report further stated that "[t]his was a disappointing quarter for PYL given investors had expected a beat and sales growth y/y decelerated to 21% from 30% last quarter. Vol gains were partially offset by price due to strategic partnerships and LNTH gave a nod to some price competition. The bigger news was that commentary on PYL in '25 was to 'sustain' the franchise vs. LNTH previously saying it would grow." The report further stated that "LNTH continues to secure strategic partnerships with customers and noted the potential to maintain a price premium vs. competition given the commercial and clinical value of PYL."

56. On November 11, 2024, Washington Analysis published a report titled "LNTH: CMS Data Error Fixed, Negative YOY Payment Rate Expected." The report stated, "[a]s we expected, CMS corrected a miscalculation in the relevant excel files for its CY25 Outpatient Prospective Payment System (OPPS) rule . . . for Lantheus' (LNTH) Pylarify, confirming the Mean Unit Cost (MUC) payment for CY[2]5 at $322.44. Thus, we expect to see an approximately 46 percent reduction in YOY payments for Pylarify based on our earlier assessment of the MUC in the proposed OPPS CY25 rule."

57. At the Jefferies London Healthcare Conference on November 20, 2024, defendant Marshall addressed CMS' updated reimbursement framework for PYLARIFY. Marshall stated that "***the price that we have to our customers doesn't change. What changes is their reimbursement scheme for 20% of the population*** . . . . That same patient in an outpatient setting – in like a freestanding medical center, ***this doesn't apply to them*** . . . ." Marshall also discussed the customer contracting, stating "***[t]hese are long-[term], these are multi-year contracts*** that would benefit both parties with ***keeping PYLARIFY as a market-leading product with pricing that is premium to its competition***."

58. The ***statements*** in ¶57 were materially misleading for the reasons alleged in ¶¶36, 41, 44, and 54, and because defendants Lantheus and Marshall were aware that the upcoming transition of PYLARIFY from ASP-based reimbursement to MUC pricing had already begun to materially alter healthcare provider economic decisions. Defendants Lantheus and Marshall were also aware that the MUC rate functioned as a benchmark for the other 80% of patients. The Company had modeled an approximate 5% sequential price decline and had already begun offering rebates and concessions to maintain customer relationships in accounts that would be affected by reimbursement differentials in CY25.

59. Heading into CY25, Lantheus and industry analysts described the overall PSMA PET market as continuing to grow, with PSMA PET representing approximately 30% of scan volume compared to roughly 70% conventional imaging modalities (bone scans, MR, and CT). Total addressable market estimates ranged between approximately $2 billion and $4 billion by 2029.

60. PYLARIFY's TPT payment status ended on December 31, 2024. Effective January 1, 2025, CMS began separate payment for PYLARIFY in the hospital outpatient setting based on

MUC pricing at approximately $332 per millicurie, which was lower than the ASP-based reimbursement provided during TPT payment status. Competing PSMA PET imaging agents retained their TPT payment status after December 31st. As a result, CMS continued to reimburse those competitors based on ASP plus 6%, while PYLARIFY was reimbursed under the materially lower MUC methodology:

| COMPONENT | PYLARIFY | ILLUCCIX | LOCAMETZ | POSLUMA |
|---|---|---|---|---|
| CALENDAR YEAR 2024 | | | | |
| TOTAL | $7,326 | $6,561 | $6,630 | $6,705 |
| *Drug* | *$5,834* | *$5,069* | *$5,138* | *$5,213* |
| *PET Scan* | *$1,492* | *$1,492* | *$1,492* | *$1,492* |
| CALENDAR YEAR 2025 (PROPOSED) | | | | |
| TOTAL | $4,610 | $6,805 | $6,653 | $6,486 |
| *Drug* | *$3,152* | *$5,347* | *$5,195* | *$5,028* |
| *PET Scan* | *$1,458* | *$1,458* | *$1,458* | *$1,458* |
| YEAR OVER YEAR DELTA (%) | | | | |
| TOTAL | -37% | 4% | 0% | -3% |
| *Drug* | *-46%* | *5%* | *1%* | *-4%* |
| *PET Scan* | -2% | -2% | -2% | -2% |

This difference in reimbursement structure created a strong financial incentive for facilities to select alternative agents rather than PYLARIFY to maximize their reimbursement and margins.

61. Entering 2025, Lantheus implemented an ***increase*** in PYLARIFY's list price, notwithstanding the pricing pressure, rebate activity, and account losses experienced during 2024.

62. In mid-January 2025, Lantheus announced a series of acquisitions expanding its radiopharmaceutical portfolio, including transactions to obtain new diagnostic assets and manufacturing capabilities in an attempt to supplement declining PYLARIFY revenue. These acquisitions were described by the Company as aligning with its strategy to diversify revenue and strengthen long-term growth, including in advance of potential new PSMA PET formulations that could qualify for renewed pass-through eligibility.

(a) On January 13, 2025, Lantheus announced the acquisition of Life Molecular Imaging, a private developer of imaging technologies for neurological diseases, which gave Lantheus exclusive worldwide rights to Neuraceq, a PET imaging agent approved for diagnostic imaging of Alzheimer's disease. Lantheus also acquired 18F-PI-2620, a tau radiodiagnostic for Alzheimer's disease in Phase III trials. The transaction was an all-cash transaction consisting of an upfront payment of $350 million and up to an additional $400 million potential earn-out and milestone payments. The news release announcing the deal stated the "acquisition is expected to immediately enhance Lantheus' near and long-term growth profile." Defendant Blanchfield stated in a conference call the same day that "this acquisition aligns squarely with our strategy to enhance our radiopharmaceutical leadership by expanding our capabilities, diversifying our business and strengthening our long-term growth potential through inorganic actions." Analysts observed that the acquisition would allow Lantheus to add immediate revenue streams with minimal incremental commercial investment.

(b) Two weeks later, on January 28, 2025, Lantheus announced the acquisition of Evergreen Theragnostics, a clinical-stage radiopharmaceutical company that provided Lantheus with exclusive worldwide rights to OCTEVY, a PET diagnostic agent targeting neuroendocrine tumors, and seven scalable manufacturing facilities enabling in-house radiopharmaceutical production. The transaction consisted of an all-cash upfront payment of $250 million and up to an additional $752.5 million in potential milestone payments. The news release announcing the deal explained that the "addition of Evergreen's scalable manufacturing capabilities and infrastructure enhances Lantheus' ability to meet the complex demands of radiopharmaceutical development and production." The release continued, stating that the "acquisition also expands Lantheus' oncology diagnostic pipeline by adding both OCTEVY, a registrational-stage PET diagnostic agent for

certain neuroendocrine tumors (NETs) that could complement Lantheus' therapeutic candidate PNT2003, as well as a number of clinical and pre-clinical novel theranostic pairs." Defendant Markison stated in a conference call that same day that "[t]his transaction, alongside our recent agreement to acquire Life Molecular Imaging, is in line with our stated strategy to expand our talent, portfolio, and capabilities to accelerate growth."

63. On February 26, 2025, Lantheus reported its 4Q24 and FY24 financial results, stating that "PYLARIFY exceeds $1 billion in net sales and becomes first ever blockbuster radiodiagnostic." The Company reported 4Q24 revenue of $391.1 million, including $266 million in PYLARIFY sales. The news release stated that "***[g]rowth was driven by increasing volumes at existing accounts partially offset by net price***." In a conference call that same day, Lantheus issued full-year revenue guidance of $1.54 billion to $1.61 billion, and stated that "***we expect PYLARIFY to grow*** low to mid-single digits on a net basis," adding that the Company remained "***well positioned to grow PYLARIFY***."

64. The FY24 Form 10-K signed by defendants Markison and Marshall and filed with the SEC that day confirmed that "[t]he calendar year 2025 payment rate for PYLARIFY is based on MUC, which will lead to a decrease in payment in 2025 relative to previous ASP-based payment methodologies." The Form 10-K also added a new risk disclosure which characterized "[a]ny delay or inability to enter into [contractual] arrangements [with hospitals, independent imaging centers, and government facilities], including our ability to negotiate favorable financial terms in these agreements, or if, despite favorable financial terms, the customers do not continue to purchase PYLARIFY" as a contingent potential risk which "***could*** have an adverse impact on our business, results of operations, financial condition and cash flows." The Form 10-K also repeated certain prior potential risk factors, including:

(a) "[W]e can give no assurances that . . . the availability of TPT Status for other diagnostic radiopharmaceuticals will not impact clinical decision making regarding which product to use for all patient populations, which ***could*** have an adverse effect on our business, results of operations, financial condition and cash flows."

(b) "If Medicare and other third party payors do not provide adequate reimbursement for the costs of our products (or services provided by healthcare providers using our products), deny the coverage of the products (or those services), or reduce current levels of reimbursement, healthcare professionals ***may not*** prescribe our products and providers and suppliers may not purchase our products."

(c) If Lantheus "lose[s] market share to existing or future competitors, including during any period of time in which our TPT Status has expired but TPT Status for a later-approved competitive products still exists, . . . . [s]uch loss of market share ***could*** have an adverse impact on our business, results of operations, financial condition and cash flows."

65. That same day, during the Company's 4Q24 earnings call, defendant Markison responded to an analyst's question about PYLARIFY pricing by stating that "***as you heard us repeatedly, our strategic contracts are in place with the vast majority of our customers***" and "we're very comfortable" with the strategy "set in motion over a year ago." He went on to mischaracterize "the fact that we have an MUC and have a separate payment" as one which "***is really upside*** to what we were originally thinking and planning." Markison further stated, "[s]o while it's true that the competition is trying to nibble at the borders, ***we've kept the wall up***," and summed it all up by reiterating that "***[w]e are well positioned to grow PYLARIFY*** . . . ."

66. During the same earnings call, defendant Blanchfield stated that "PYLARIFY remains the clear number one utilized PSMA PET imaging agent. ***We plan to build on this success***

***by growing both volume and net sales in 2025 and are confident that we will maintain our market leadership and relative price premium, even amidst competitive pressures***."

67. During that same earnings call, defendant Marshall stated, "***[w]e expect PYLARIFY to grow low to mid-single digits on a net basis***," without identifying any material limitation.[7] Marshall further noted that the PYLARIFY guidance "***scenario is going to capture like a very nice growth profile no matter where we are in the whole thing and sort of is very reflective of the hard work that the commercial team has done to get these strategic partnerships put in place***."

68. During the same earnings call, defendant Morgan doubled down on how defendants viewed PYLARIFY's growth prospects, stating "***we secured the vast majority of hospital and freestanding imaging centers with multiyear contracts***. This will enable us to continue to leverage our strategic partnerships. What I'll say is that I'm very pleased with the evolution of this strategy and the partnerships. ***We expect to continue to capitalize on PYLARIFY's clinical and commercial differentiation to support its clear market leadership and pricing premium even with the current competitive market dynamics***." Morgan further stated that "by driving differentiation through clinical and commercial differentiation, our long-term strategic partnerships and an optimal customer experience, ***we plan to continue to grow PYLARIFY both in volume and net sales in 2025***." Morgan reiterated that "[w]e really have been able to, as we shared, ***really secure a vast majority of our hospitals and freestanding imaging centers***."

69. The statements in ¶¶63-68 were materially misleading for the reasons stated in ¶¶41, 44, 54, and 58, and in light of contemporaneous information known to defendants regarding

---

[7] In contrast, Marshall stated that DEFINITY – Lantheus' other main product – would "face headwinds from opportunistic sales in 2024."

reimbursement-driven pricing pressure, contract instability, and utilization trends affecting PYLARIFY. In addition, defendants knew, or recklessly disregarded, the following material facts:

(a) By late 2024 and continuing into early 2025, the PSMA PET imaging market had become increasingly price-sensitive as multiple comparable agents were available and the competitor products retained ASP-based TPT reimbursement. Although PYLARIFY had a longer shelf life and some providers perceived PYLARIFY's images as crisper than those of gallium-based alternatives, customer purchasing decisions increasingly reflected reimbursement economics rather than perceived clinical distinctions, particularly as compared to Posluma (PYLARIFY's F-18 competitor), which used an identical isotope as PYLARIFY but still benefited from TPT payment status during the Class Period. During late 2024 and early 2025, internal PYLARIFY performance reports and dashboards reflected growing demand for price concessions, expanded rebates, renegotiations of existing agreements, and account losses – particularly among price-sensitive customers, which were converting to Posluma. *See supra* ¶41. Sales personnel reported that key hospital accounts were demanding pricing concessions and evaluating competitors that retained TPT-based reimbursement advantages. These developments reflected a marketplace in which PYLARIFY was being treated as a commodity.

(b) In approximately February 2025 at a meeting in Miami, Lantheus senior executives – including defendants Markison, Marshall, and Morgan – saw a slide deck analyzing trends in the number of imaging sites using PYLARIFY which showed that PYLARIFY was losing approximately 100 smaller imaging sites per month, and that the trend had been accelerating since late 2024. After this meeting, despite seeing the slide deck showing the loss of sites, defendants did not change guidance to reflect the accelerating site attrition or its impact. Around this time, defendant Morgan received an email from the commercial team containing an Excel spreadsheet

showing that the loss of the sites risked impacting Lantheus revenues on the order of between $100 million to $150 million.

(c) After the February 2025 meeting, Lantheus tried to make up for the loss of accounts by announcing a SPIF (Sales Performance Incentive Fund) – an additional bonus that sales people could receive by meeting a specific goal. The SPIF, overseen by defendant Morgan and the Head of Salesforce Effectiveness at Lantheus, was introduced as a way to get the lost accounts back.

(d) Despite defendants' access to contemporaneous internal information regarding PYLARIFY orders and sales and increasing rebate provisions and pricing concessions beginning in 3Q24 and continuing into 2025, the Company's risk disclosures continued to frame reimbursement-related impacts as potential future risks rather than known trends already affecting pricing and customer negotiations. The Company's February 26, 2025 Form 10-K confirmed that rebates and allowances increased from $42.7 million in 3Q24 to $63.5 million in 4Q24, with payments rising from $36.9 million to $54.3 million, reflecting continued price compression.

70. On February 26, 2025, TD Cowen issued a report on Lantheus, echoing defendants' talking points and stating that "[m]odest Q/Q revenue growth for Pylarify was attributed to increased volume from existing accounts, offset by net price impacts from long-term strategic partnerships, though net price was flat Q/Q. . . . Net pricing impacts should be somewhat offset by the 6% increase in Pylarify WAC price at the beginning of 2025." The report continued:

> The company reaffirmed its expectations for continued Pylarify growth, driven by expansion of the PSMA PET addressable market that is expected to reach $3.5B by 2030 through increased conversion of bone scans in the initial staging and BCR patient segments, which will drive higher Pylarify volume demand among its partners under long-term strategic agreements.
>
> While 2025 revenue will be more reflective of pricing dynamics resulting from these strategic contracts, management anticipates a return to a more traditional

seasonal revenue cadence in 2026, as these contracts are multi-year agreements, allowing for greater net pricing stability and normalization of revenue patterns.

* * *

**The Updated Medicare Fee For Service Reimbursement Scheme Is Unlikely To Lead To Significant Near- Or Long-Term Impact For Pylarify**

* * *

While the MUC price is lower than the current payment rate, management expects only ~10% of total patients will be impacted by the updated pricing because this only impacts the ~20% of Medicare patients that are reimbursed via Fee For Service. Additionally, the company has planned ahead by forming long-term partnerships and high-touch interactions with customers to ensure continued use. . . .

71. Similarly, Mizuho issued a report on February 27, 2025, with the subtitle "Initial '25 Guide Suggests Pylarify Can Navigate Payer + Competitive Headwinds: Stay OP." The report further noted, in bold, that Lantheus was "looking increasingly capable of landing PYLARIFY plane amid reimbursement/market turbulence." The report continued:

**Key 4Q debates: Stable PYLARIFY and EPS outlooks surprise to upside**. Shares are trading +16% (vs. SPX flat) on three key items: 1) initial '25 guidance calling for low- to mid-single PYLARIFY growth despite reimbursement / competitive pressures, 2) upward revised PSMA PET TAM of $3.5bn by 2030 (prior $3.0bn by 2029) on continued share gains from bone CT scans across a wider range of patients, and 3) an initial EPS outlook that came in +$0.12 at the midpoint despite the Y/Y slowdown in PYLARIFY. The quarterly cadence of PYLARIFY is forecasted to be flat to slightly down in 1Q followed by steady improvements throughout the year driven by market expansion and "stability in revenue share" which should offset price headwinds from strategic contracting efforts.

72. On March 4, 2025, during the TD Cowen Healthcare Conference, defendant Markison stated that "***what gives me confidence is the turn of the calendar year led to the full effect of our strategic cont[r]acts, contracts coming into effect. . . . [T]he vast majority of our customers are under [these] contracts***." Markison described early-year disruption under CMS' new reimbursement framework as "a ***small percentage of our business***" and stated that "***things***

***will begin to stabilize*** as we come out of the second quarter and the full effect of our contracts begins to level off in the marketplace."

73. The ***statements*** in ¶72 were materially misleading in light of contemporaneous information known to defendant Markison, including that Lantheus' so-called "strategic partner" contracts didn't "lock up anything." *See* ¶¶41, 44, 54, 58, 69. In addition, by February and March of 2025, internal reporting reflected contract renegotiations, customer requests for price concessions, volume pressure, and the loss of significant hospital accounts associated with the MUC reimbursement structure. *See supra* ¶41.

74. On May 7, 2025, Lantheus reported its 1Q25 financial results which fell below market expectations and lowered its full-year guidance. For the first time in 16 consecutive quarters, PYLARIFY sales declined year-over-year despite defendants' statements just two months before expressing confidence in continued PYLARIFY net sales growth for 2025.

75. In the 1Q25 Form 10-Q signed by defendants Markison and Marshall and filed with the SEC that same day, Lantheus did not revise the potential risk factors below that were included in the prior Form 10-K:

(a) "Any delay or inability to enter into [contractual] arrangements [with hospitals, independent imaging centers and government facilities], including our ability to negotiate favorable financial terms in these agreements, or if, despite favorable financial terms, the customers do not continue to purchase PYLARIFY, ***could*** have an adverse impact on our business, results of operations, financial condition and cash flows."

(b) "[W]e can give no assurances that . . . the availability of TPT Status for other diagnostic radiopharmaceuticals will not impact clinical decision making regarding which

product to use for all patient populations, which ***could*** have an adverse effect on our business, results of operations, financial condition and cash flows."

(c) "If Medicare and other third party payors do not provide adequate reimbursement for the costs of our products (or services provided by healthcare providers using our products), deny the coverage of the products (or those services), or reduce current levels of reimbursement, healthcare professionals ***may not*** prescribe our products and providers and suppliers may not purchase our products."

(d) If Lantheus "lose[s] market share to existing or future competitors, including during any period of time in which our TPT Status has expired but TPT Status for a later-approved competitive products still exists . . . . [s]uch loss of market share ***could*** have an adverse impact on our business, results of operations, financial condition and cash flows."

76. During the accompanying earnings call, defendant Morgan characterized the setback as "***temporal***" and attributed it to "***competitive disruption among smaller non-contracted sites***." Morgan further stated that "***[w]e plan to maintain our market leadership and will continue to work through these competitive pressures and grow volume and revenue in 2025***." Morgan also reiterated that "***[w]e have successfully executed our strategy to secure the vast majority of PYLARIFY revenue through strategic partnerships with key hospitals and free-standing imaging centers***."

77. During that same earnings call, defendant Blanchfield stated that "[w]e are ruthlessly prioritizing key growth areas like PET radiodiagnostics and radiotherapeutics," and stated:

(a) "***[W]e were successful in securing the vast majority of our revenues through the strategic partnerships***" and noted that these "partnerships were key to stabilizing the business."

(b) "***[W]e did experience short-term competitive disruption specifically among the smaller non-contracted sites due to MUC-related reimbursement, price, as well as product availability***. . . . We continue to work through competitive pressures and some of these market dynamics. ***But we do plan to maintain our market leadership to grow volumes and revenues*** and to expand our contracting efforts with some of these higher growth later-adopter accounts as well as expanding product availability to ensure that we can continue to meet the growth and ensure our growth grows closer to that of the broader market."

(c) In response to a question regarding the extent of the MUC-based pricing impact on revenue, Blanchfield stated, "***[s]o the MUC-based pricing remains impacting about 20% of patients***" and claimed that "***MUC is likely more of a transitory impact*** . . . ."

78. Speaking about the two recent acquisitions, defendant Markison stated that "they add immediate revenue growth drivers that complement our business and diversify our revenue."

79. During the same earnings conference call, an analyst asked "have you seen any evidence of switching either at the large accounts or the small accounts or even on a patient basis so far?" Defendant Markison responded that "***if you look at our later adopters, smaller accounts that we have not focused on, there has been a bit of what I would call stroke of the pen risk with them switching over to other agents*** . . . . ***And we really focused again, as we've said repeatedly on our major accounts, right, those that have the majority of the volume*** and also providing the most cutting-edge treatment. I think in the smaller accounts, again, and ***we know where every***

***dose is going*** because our PMF partners are doing a great job delivering those doses. If they're doing one or two scans a week, we're not going to drop everything and go visit them."

80. The ***statements*** in ¶¶74-79 were materially misleading for the reasons stated in ¶¶41, 44, 54, 58, 69, and 73, and in light of contemporaneous information regarding reimbursement-driven pricing pressure, contract instability, and utilization trends affecting PYLARIFY. In addition, defendants knew, or recklessly disregarded, the following material facts:

(a) Beginning in 3Q24 and continuing into 2025, Lantheus had been offering pricing concessions and rebates – including rebates of up to approximately 30% tied to share-of-practice targets – to retain business in accounts affected by MUC pricing. The Company's May 7, 2025 Form 10-Q confirmed that rebates and allowances had doubled year-over-year, reflecting ongoing pricing pressure and that healthcare providers were using 340B pricing to protect hospital margins.[8]

(b) By early 2025, internal data showed that contract renegotiations and pricing concessions were not confined to isolated non-contracted accounts but were more broadly affecting PYLARIFY customers. PYLARIFY's lagging sales numbers were discussed at a Lantheus national sales meeting in March 2025.

---

[8] The 340B Drug Pricing Program is a federal program that requires pharmaceutical manufacturers to provide outpatient drugs to certain healthcare organizations – known as "covered entities" – at significantly reduced prices. These covered entities include safety-net providers such as Health Resources and Services Administration supported health centers, specialized clinics, and certain types of hospitals, including Disproportionate Share Hospitals, children's hospitals, and free-standing cancer hospitals. The pricing mechanics of the 340B program are strictly regulated. To participate in Medicaid and Medicare Part B, manufacturers must enter into an agreement with the Secretary of Health and Human Services to charge covered entities no more than a "statutory ceiling price." This ceiling price is calculated using a formula based on the Average Manufacturer Price and the Unit Rebate Amount from the prior quarter. As such, any downward shift in a drug's market price or an increase in commercial rebates triggers a corresponding price reset, further lowering the mandatory 340B ceiling price.

(c) These developments constituted a known trend and uncertainty that management had identified and that was reasonably likely to have a material impact on revenue, given that PYLARIFY accounted for approximately 60-70% of Lantheus' revenue. Defendants failed to disclose this trend and its expected impact as required by Item 303 of Regulation S-K, rendering their affirmative statements regarding PYLARIFY growth, pricing stability, limited exposure, and contractual security materially misleading.

81. On May 7, 2025, despite defendants' misleading positive statements, following the Company's announcement of 1Q25 results and revised full-year guidance, Lantheus' stock price declined approximately 23%, reflecting a significant negative market reaction to the disclosures.

82. On May 7, 2025, a Jefferies analyst issued a report reducing its Lantheus price target from $140 to $130 and echoing defendants' commentary that "[f]or PYLARIFY, LNTH continues to maintain that strategic partnerships have been secured with the vast majority of its key customers, but it did call out 'temporal' competitive disruption among smaller, non-contracted sites."

83. On June 10, 2025, at the Goldman Sachs Global Healthcare Conference, defendant Markison stated that "***right now, our strategic contracts are in place to basically keep the account whole on that segment of the population that has – that change of reimbursement***."

84. The ***statement*** in ¶83 was materially misleading for the reasons stated in ¶¶41, 44, 54, 58, 69, 73, and 80 and because in the summer of 2025, Lantheus senior leadership was delaying approval of certain contracts being negotiated by the Market Access team, telling Market Access they should wait until 2026 to finalize the contracts. Following the Evergreen and Life Molecular acquisitions, Lantheus senior management also delayed new contracts with PYLARIFY customers in order to be able to bundle the newly acquired products with PYLARIFY at a later date.

85. On August 6, 2025, Lantheus reported its 2Q25 financial results, admitting it had "navigated increased competition in the PSMA PET landscape, which impacted PYLARIFY performance." The Company disclosed that, although volume modestly increased by 2%, PYLARIFY revenue declined 8.3% year-over-year. The news release quoted defendant Markison as saying, "[w]e are taking actions to reinforce PYLARIFY's clinical differentiation and support the value of our PSMA PET franchise." Lantheus also reduced its full-year revenue guidance by $75 million from the forecast provided just six months earlier.

86. The 2Q25 Form 10-Q signed by defendants Markison and Marshall and filed with the SEC that same day disclosed that rebates and allowances had dramatically increased over 160% from $26 million in 1Q25 to $68 million in 2Q25, far in excess of the 133% increase in payments made during the period (from $18.2 million to $42.5 million).

87. The risk factors in the 2Q25 Form 10-Q were materially updated as follows:

(a) The Form 10-Q removed the following risk factor: "Any delay or inability to enter into [contractual] arrangements [with hospitals, independent imaging centers and government facilities], including our ability to negotiate favorable financial terms in these agreements, or if, despite favorable financial terms, the customers do not continue to purchase PYLARIFY, ***could*** have an adverse impact on our business, results of operations, financial condition and cash flows."

(b) The Form 10-Q repeated the same risk factor from the prior quarter that: "If Medicare and other third party payors do not provide adequate reimbursement for the costs of our products (or services provided by healthcare providers using our products), deny the coverage of the products (or those services), or reduce current levels of reimbursement, healthcare

professionals ***may not*** prescribe our products and providers and suppliers may not purchase our products."

(c) The Form 10-Q added the following new risk factors:

(i) "To the extent that PYLARIFY is not available at preferred times, end users have, in some instances, switched to available competitive products."

(ii) "Obtaining adequate coding, coverage, and payment for PYLARIFY is critical, including not only coverage from Medicare, Medicaid and other government payors, as well as private payors, but also appropriate payment levels to adequately cover our customers' costs of using PYLARIFY in PET/computed tomography ('CT') imaging procedures."

(iii) "[W]e can give no assurances that . . . the availability of TPT Status for other diagnostic radiopharmaceuticals will not continue to impact clinical decision making regarding which product to use for all patient populations, which could have an adverse effect on our business, results of operations, financial condition and cash flows."

(iv) "Our ability to negotiate and realize the benefits from strategic contracts is also key to our ability to maintain and expand market share. Despite these efforts, we have seen net price compression and lost market share to certain competitors that have later approved products with TPT Status at a time when PYLARIFY's TPT Status has expired, and we may experience further net price compression or lose market share to future competitive products due to reimbursement status as well as due to the impact of any potential generic entrant to the market. Such loss of market share could have an adverse impact on our business, results of operations, financial condition and cash flows."

(v) "[W]e have seen net price compression and lost market share to certain competitors that have later approved products with TPT Status at a time when PYLARIFY's TPT Status has expired, and we may experience further net price compression or lose market share to future competitive products due to reimbursement status as well as due to the impact of any potential generic entrant to the market. Such loss of market share could have an adverse impact on our business, results of operations, financial condition and cash flows."

88. During the earnings call with investors that same day, defendant Markison finally acknowledged the following facts:

> In the back half of the quarter, the confluence of MUC-based reimbursements and aggressive discounting by what had been a somewhat dormant F-18 competitor led some economically sensitive customers to reassess their choice of PSMA agents. This led to the renegotiation of some existing strategic partnerships as well as a conscious decision to walk away from those volumes at certain accounts that requested pricing terms that were not in the long-term interest of our PSMA PET franchise.
>
> * * *
>
> We understand the dynamics that we faced during the quarter, how we expect these dynamics to evolve in the second half of the year, and how these changes impact our business. We have implemented actions to ensure we maintain our market leadership and maximize the long-term value of the franchise.
>
> These actions include conducting a continuous and comprehensive review of our customer base, expanding our strategic partnerships to the smaller high growth accounts, enhancing our availability and geographic reach, proactively communicating the value proposition of PYLARIFY and our growing innovative radiopharmaceutical portfolio including Neuraceq, and executing a disciplined pricing strategy. Lantheus has a leading role in the prostate cancer market, and our strategy and actions will enable the sustained growth and success of this franchise.
>
> * * *
>
> Part of our decision to remain disciplined with our pricing is to preserve the value of our PSMA PET franchise in anticipation of launching our new PSMA PET agent. If approved, we believe it will be eligible for three years of transitional pass-through payment status and will reinvigorate growth.
>
> * * *

> The acquisitions of Evergreen on April 1 and Life Molecular on July 21 add complementary capabilities, bring immediate growth drivers, expand our pipeline, and importantly, diversify our revenue, positioning us for long term growth.
>
> * * *
>
> To underscore our confidence in our long-term strategy and our ability to execute, the Board has authorized a new $400 million stock repurchase program.

89. In response to an analyst's question regarding the proportion of contracted business, defendant Markison continued to maintain that "the vast majority of our business is under contract," while finally acknowledging that "some of our accounts had much greater exposure, if you will, to the MUC reimbursement dynamic than the classic 20% that would normally be across the board exposed to this through traditional Medicare." Defendant Blanchfield further explained that "[w]e have conducted a bottoms-up review of all of our contracts, Brian, myself, and our commercial team. We have proactively reached out to customers. We do believe there is stabilization emerging in the marketplace, and that those will prove continued value-added for the long-term health of the business." Defendant Blanchfield further stated:

> As Brian mentioned, in the back half of the quarter, PSMA PET competitive pricing pressures intensified, particularly from an F-18 competitor. And we experienced an increase in account losses which significantly impacted volume in the latter half of May and June. The majority of the impact occur in accounts that had greater exposure to MUC-based reimbursement and a greater focus on economics. We made the intentional decision to remain disciplined with our pricing strategy, even at the cost of losing select accounts, rather than chase volume and harm the long-term value of our PSMA PET franchise.
>
> Additionally, those competitive price offerings, combined with our MUC-based reimbursement, led to an increase in renegotiations of some existing partnerships, resulting in further net price compression during the quarter. These dynamics overshadowed the progress we made in expanding strategic partnerships with smaller later adopters where our volume growth outpaced that of our larger accounts.
>
> * * *
>
> As we look ahead to the remainder of the year, we expect volume growth to continue to be positive, albeit below that of the broader market. We will also see

> further net price compression as recently renegotiated contracts annualized and 340B or best price resets, particularly in the fourth quarter of 2025 as a result of the two-quarter lag in government price reporting.
>
> I want to reaffirm Lantheus' commitment to maintaining PYLARIFY's market leadership. We are navigating current market dynamics with discipline and focus, guided by clear strategic principles that are in the long-term interest of the franchise.
>
> PYLARIFY will continue to command a premium price in the market. This is driven by PYLARIFY's clear and compelling clinical performance, which is an area we are increasing our emphasis specifically through increased investment in our medical affairs function.

90. Defendant Markison also stated that "[p]art of our decision to remain disciplined with our pricing is to preserve the value of our PSMA PET franchise in anticipation of launching our new PSMA PET agent. If approved, we believe it will be eligible for three years of transitional pass-through payment status and will reinvigorate growth. . . . We expect the new formulation to completely replace PYLARIFY as it currently exists in the marketplace."

91. These disclosures revealed that MUC-based reimbursement and competitive discounting had resulted in renegotiated contracts, net price compression, and account losses – developments that were inconsistent with defendants' prior public statements but consistent with their contemporaneous knowledge. *See* ¶¶36, 41, 44, 54, 58, 69, 73, 80, 84. Although their prior statements had emphasized limited exposure and contractual stability, the August 6 disclosures finally publicly acknowledged intensified pricing pressure, lost market share, and continued margin compression. Notwithstanding Lantheus' simultaneous announcements that the FDA had accepted the Company's NDA for a new formulation of PYLARIFY and the Company had authorized a $400 million stock repurchase program to buoy Lantheus' share price, following these disclosures, Lantheus' stock price declined approximately 29%, falling from $72.63 per share on August 5, 2025 to $51.87 per share on August 6, 2025. The nearly 29% stock decline represents

the largest single-day percentage decline Lantheus stock has suffered since it was publicly listed in 2015.

92. On August 6, 2025, a Cowen Research analyst issued a report reducing its Lantheus price target from $110 to $95 and parroting defendants' analysis that poor PYLARIFY revenue was driven by "increased competitive intensity and subsequent account losses, which impacted volume in May/June" and "intensified competition from another F18-based competitor (likely Blue Earth Diagnostics' Posluma), which entered with broader and more aggressive pricing than anticipated – shifting the market dynamic toward a 'best price wins' environment."

**Significant Post-Class Period Events**

93. On August 7, 2025, one day after the release of the disappointing 2Q25 results and the subsequent 29% stock decline, defendant Morgan informed the Company she would take a leave of absence for "personal reasons," effective immediately.

94. On August 11, 2025, a Truist Securities analyst issued a report downgrading Lantheus from a "Buy" to a "Hold" and lowering its price target from $111 to $63, noting that "[w]eakness in Pylarify (-8% y/y vs. our -4% expectation) was driven by the confluence of MUC reimbursement in addition to 'aggressive discounting' by Blue Earth's (Bracco, Private) POSLUMA. The combination of MUC related pricing headwinds, and LNTH's decision to 'walk away' from business at certain accounts rather than further reduce ASP to keep business . . . led to both a lower than expected unit growth (+2% y/y, 4% q/q) including a -10% price headwind in the qtr. (vs. our projection for -8%)."

95. On September 9, 2025, defendant Markison spoke at a Morgan Stanley Global Healthcare Conference and in response to a question regarding recent PYLARIFY headwinds,

finally acknowledged that the switch to MUC pricing in January "was a meaningful discount" and "was a big hit" to Medicare FFS patients.

96. On September 12, 2025, Lantheus submitted comments to CMS regarding the proposed OPPS rule for CY26 (CMS-1834-P), again urging CMS to adopt ASP-based reimbursement rather than MUC pricing. The letter stated that "[i]n meetings with OPPS staff, Lantheus has provided invoices to show that the calculated MUC for an individual hospital does not reflect the price paid by the hospital for PYLARIFY." The submission included a comparison of ASP and MUC pricing for PYLARIFY reflecting a 38-40% difference between the two methodologies. Lantheus further stated that "[w]here there are multiple diagnostic radiopharmaceuticals that may be appropriate for a patient's care and a subset of those have pass-through status, the products under pass-through have a competitive advantage due to a higher payment rate relative to acquisition cost." The letter also acknowledged that "[i]nconsistency in payment methodology creates perverse incentives for hospitals when it comes to choosing the most clinically appropriate diagnostic radiopharmaceutical."

97. On October 31, 2025, defendant Blanchfield notified the Company that he had accepted a role at another company and was leaving Lantheus.

98. On November 6, 2025, Lantheus reported its 3Q25 financial results, disclosing that PYLARIFY sales again decreased 7.4%. Defendant Markison said Lantheus would be "prioritizing PYLARIFY commercial execution with focus and discipline, while advancing our broader strategic diversification plan, including our new PSMA PET formulation."

99. The 3Q25 Form 10-Q Lantheus filed that same day with the SEC disclosed the continued dramatic increases in rebates and allowances, rising $47.5 million from $68 million in 2Q25 to $115.5 million in 3Q25, with payments made during the period increasing $34.4 million

from $42.5 million to $76.9 million. The 3Q25 Form 10-Q risk factors were materially updated, including ***modifications*** to warnings to investors that:

(a) "Although PYLARIFY continues to be paid separately, other competitive PSMA PET imaging agents continue to have TPT Status after December 31, 2024, including a new PSMA PET imaging agent with TPT Status effective on October 1, 2025, and hospital use of those products, for the approximately 20% of patients with traditional Medicare fee-for-service ("FFS") in the hospital outpatient setting, generally will be paid separately based on ASP plus six percent rather than on MUC, ***which could provide a financial incentive to use an imaging agent other than PYLARIFY***."

(b) "[W]e have seen net price compression and lost market share to certain competitors that have later approved products with TPT Status at a time when PYLARIFY's TPT Status has expired, and we may experience further net price compression or lose market share to these or future competitive products due to reimbursement status due to the impact of any potential generic entrant to the market ***or the potential that additional rebates may be offered to customers, including when a PSMA PET imaging agent is purchased as one part of a broader portfolio of products***. Such loss of market share could have an adverse impact on our business, results of operations, financial condition and cash flows."

100. In a separate news release that same day, Lantheus announced a "Leadership Transition Plan," stating that Markison "will retire from the Company" and that the Board "has initiated a comprehensive search process to help identify a new CEO." The Company announced prior CEO Heino would return to the helm as interim CEO. Lantheus further announced that Blanchfield "has accepted a role at another company and is leaving Lantheus" and that Morgan "will return from leave" and would be "reporting directly to Ms. Heino."

101. During the earnings call with investors and analysts that same day, defendant Markison stated that "large institutions continued to diversify their PSMA agents across PYLARIFY and Gallium 68 agents." He also explained that Lantheus was "actively mitigating the impact" of the 340B hospital pricing resets from the prior quarter "through targeted commercial strategies." Defendant Marshall acknowledged that the Company had repurchased approximately $100 million of its stock during the quarter.

102. Following these disclosures, Lantheus' stock price declined from $57.23 per share on November 5, 2025 to $51.07 per share on November 7, 2025.

103. On February 26, 2026, Lantheus reported its 4Q25 and FY25 financial results, including $240.2 million in fourth quarter PYLARIFY sales, a year-over-year decrease of 9.7%, and full year PYLARIFY sales of $989.1 million, a year-over-year decrease of 6.5%. The Company announced "that it is sharpening its strategic focus to innovative radiodiagnostics and pursuing value-maximizing alternatives for radiotherapeutic assets to support long-term growth." Interim CEO Heino explained that "'[i]n 2026, we are aligning our strategic focus on PET radiodiagnostics, with clear priorities around execution and investment.'" Notably, the Company also issued full year 2026 revenue guidance below 2025 reported revenue, indicating that sales of PYLARIFY are expected to continue their downward trajectory.

104. The 4Q25 and FY25 Form 10-K Lantheus filed that same day with the SEC revealed that rebates and allowances continued to increase dramatically, from $115.5 million in 3Q25 to $167.6 million in 4Q25, with payments made during the period likewise rising from $76.9 million to $126.4 million.

105. The Form 10-K finally acknowledged the reality surrounding PYLARIFY, no longer misleadingly characterizing Lantheus' "success in ***growing*** PYLARIFY" but rather its

"success in ***continuing to generate substantial revenue from*** PYLARIFY." Relevant new risk factors were added, including the following:

(a) "[I]n order to remain competitive, in certain circumstances, we provide customers with rebates, which we estimate as a reduction to revenue at the time revenue is recognized. Judgment is required in making these estimates. These rebates can include performance-based offers that are based on attaining contractually specified sales volumes, Medicaid rebate programs for our products, administrative fees of group purchasing organizations and certain distributor-related commissions. The calculation of the accrual for these rebates is based on an estimate of the third-party's expected purchases and the resulting applicable contractual rebate to be earned over a contractual period and our estimates can vary by program, product, type of customer and geographic location. In determining the appropriate accrual amount, we consider the contractual terms, historical sales, and changes in sales trends. Specific rebates can impact year-over-year individual product revenue growth trends. If any of our assessments, assumptions, experiences or judgments are not indicative or accurate estimates of our future experience, our results could be impacted."

(b) "Our success depends on our ability to manage and improve our existing products, develop and commercialize new products and new indications, and respond effectively to competitive and technological developments. This requires, among other things, our ability to fund product development and lifecycle management initiatives; anticipate and respond to customer needs and competitive actions; collect, analyze, and derive meaningful insights from available data; obtain timely regulatory approvals; manufacture products efficiently and reliably; protect and leverage our intellectual property; and meaningfully differentiate our products in the marketplace. . . . If we are unable to effectively manage our existing products or successfully

introduce new or improved products or indications on a timely basis, our business, results of operations, financial condition, and cash flows could be materially adversely affected."

(c) "[R]eliable, comprehensive, and real-time market data for certain products and indications is limited. As a result, we rely on a combination of historical sales data, information provided by third-party manufacturing and distribution partners, third-party medical claims data, primary market research, and other publicly available information to estimate market size, assess trends, and make strategic decisions. These assessments require assumptions that may be inaccurate, incomplete, or untimely. If our assumptions regarding market size, growth, adoption rates, or competitive dynamics are incorrect, we may make strategic or investment decisions – such as those relating to resource allocation, geographic expansion, or commercialization strategy – that fail to achieve their intended results, which could materially adversely affect our business, results of operations, financial condition, and cash flows."

106. During the conference call with analysts and investors, interim CEO Heino stated that Lantheus' "strategy and related investment going forward will focus on radiodiagnostics. . . . As part of this strategy, we have decided to pursue value-maximizing alternatives for the radiotherapeutic assets in our pipeline." Looking forward, defendant Marshall stated that the "forecast for PYLARIFY considers the annualization of pricing decisions made in 2025 and related impacts, as well as the potential for renewed competitive dynamics as the year progresses." He further warned that "we see PYLARIFY net revenue declining 8% to 10% year-over-year, consisting of increased volume offset by modest price erosion." These statements confirm that pricing concessions and strategic portfolio adjustments were not temporary reactions, but material developments affecting the Company's revenue.

## ADDITIONAL SCIENTER ALLEGATIONS

107. The following contemporaneous actions and financial incentives, taken together with defendants' access to and/or knowledge of detailed internal reporting, support a strong inference that defendants knew, or at a minimum recklessly disregarded, the true facts about PYLARIFY sales throughout the Class Period.

**December 2024 Credit Facility Amendment**

108. On December 19, 2024 – just weeks before PYLARIFY's TPT payment status expired on December 31, 2024 – Lantheus entered into an amendment to its revolving credit facility that increased total borrowing capacity from $350 million to $750 million, extended the maturity date to December 2029, and reduced applicable interest margins. As a condition to the effectiveness of the amendment, the Company was required to reaffirm that its existing representations and warranties – including those incorporating the defined term "Material Adverse Effect," which encompasses material adverse changes in the business, operations, or financial condition of the Company and its subsidiaries taken as a whole – remained true and correct as of the amendment date, and to certify that no default or event of default was continuing. At that time, defendants had access to internal sales dashboards and financial reporting reflecting increasing rebate provisions, contract renegotiations, price concessions, emerging volume pressure, and account losses associated with the MUC reimbursement transition. Securing expanded liquidity and improved borrowing terms in December 2024, just months before publicly disclosing intensified pricing pressure, net price compression, and reduced guidance, supports a strong inference that defendants were aware but suppressed the fact that the deterioration affecting PYLARIFY was structural rather than temporary.

**Executive Compensation Incentives**

109. The Individual Defendants had an immediate financial incentive to delay disclosing PYLARIFY's structural pricing erosion. This delay was specifically designed to protect their Performance Stock Units ("PSUs"), a form of equity compensation that pays out only if the company's stock performs well relative to its industry peers – a metric known as relative Total Shareholder Return ("rTSR"). Under Lantheus's policy, if the Company ranks in the top 25% of its peers, executives receive a 200% maximum payout, effectively doubling their share award. By maintaining an artificially inflated stock price of $89.46 per share through the critical December 31, 2024 measuring date, the leadership team secured a $9.27 million windfall – the specific "delta" or extra value gained by hitting that maximum 200% threshold instead of a standard 100% target. To help guarantee this outcome, the Board used corporate assets to aggressively repurchase $100 million of Company stock in the 60 days preceding the measuring date. This massive expenditure provided the artificial support to lock in a favorable rTSR ranking and the corresponding multi-million dollar equity payouts for themselves, even as they internally observed the very pricing cliff they were denying to the public.

110. The compensation structure rewarded top-line growth and stock outperformance above all else. By framing the CMS change as a minor issue affecting only 20% of Medicare FFS patients in the hospital outpatient setting, Lantheus executives were able to trigger maximum payouts in 2024 before the negative impact of the MUC price floor became impossible to hide:

| **Metric** | **Weight** | **2024 Outcome** | **Impact on Bonus** |
|---|---|---|---|
| **Net Revenue** | 40% | $1.533B (vs $1.46B target) | 123% Payout |
| **Bonus EPS** | 30% | $6.17 (vs $5.91 target) | 115% Payout |
| **Strategic Goals** | 30% | "Exceeded" (PSMA growth) | 118% Payout |
| **Stock (PSUs)** | - | 100th Percentile TSR | 200% Payout |

**Stock Repurchase Activity During Period of Undisclosed Pricing Deterioration**

111. During the first ten months of 2024, Lantheus did not repurchase any of its own stock, other than shares withheld to satisfy tax obligations related to employee equity awards.

112. In November 2024, the Lantheus Board of Directors authorized a program to repurchase up to $250 million of the Company's stock over the next 12 months. The most aggressive repurchases occurred immediately before and after earnings disclosures, including approximately $100 million in the 60 days preceding the December 31, 2024 PSU measurement date and additional $100 million purchase in May 2025, as the table below indicates:

| *Period* | *Shares Purchased as Part of Publicly Announced Program* | *Approx. $ Value of Shares Remaining for Purchase Under the Program* |
|---|---:|---:|
| January 2024 | -- | -- |
| February 2024 | -- | -- |
| March 2024 | -- | -- |
| April 2024 | -- | -- |
| May 2024 | -- | -- |
| June 2024 | -- | -- |
| July 2024 | -- | -- |
| August 2024 | -- | -- |
| September 2024 | -- | -- |
| October 2024 | -- | -- |
| November 2024 | 907,279 | $168.8 million |
| December 2024 | 208,729 | $150.0 million |
| January 2025 | -- | -- |
| February 2025 | -- | -- |
| March 2025 | -- | -- |
| April 2025 | -- | -- |
| May 2025 | 1,259,865 | $50.0 million |
| June 2025 | -- | -- |
| July 2025 | -- | -- |
| August 2025 | 1,755,654 | $300 million |
| September 2025 | -- | -- |
| October 2025 | -- | -- |
| November 2025 | 1,215,731 | $231.9 million |
| December 2025 | 554,913 | $200.0 million |

113. On July 31, 2025, the Lantheus Board authorized a program to repurchase up to $400 million of the Company's stock through December 31, 2027.

114. In August 2025, Lantheus spent approximately $100 million purchasing 1.75 million of its own shares at an average price of $56.93 per share.

115. In November and December 2025, Lantheus spent approximately $100 million to purchase an additional 1.7 million of its own shares.

116. The timing and magnitude of these repurchases coincided with periods surrounding the Company's earnings releases and stock price volatility.

**Strategically Timed Acquisitions**
**Plug PYLARIFY Revenue Hole**

117. The Individual Defendants further demonstrated their scienter by orchestrating the acquisitions of Life Molecular Imaging and Evergreen Theragnostics shortly after PYLARIFY lost its TPT status. These acquisitions were defensive maneuvers designed to plug the revenue hole left by PYLARIFY's loss of TPT status. The acquisitions were designed to capture the immediate revenue streams from Neuraceq and other acquired assets as PYLARIFY transitioned to the lower MUC reimbursement rate, thereby offsetting Lantheus' revenue deterioration.

118. This revenue-patching strategy allowed defendants to maintain the illusion of a stable "blockbuster" franchise and represent that PYLARIFY's pricing constraints were temporal and seasonal. Internally, defendants were aware that PYLARIFY's margins were compressing due to PYLARIFY's new MUC reimbursement rate and the need for massive rebates to prevent account churn. By inorganically inflating the Company's top-line revenue through these timely acquisitions – which contributed $51.4 million in 2025 revenue from Neuraceq alone – defendants sought to delay the market's realization of PYLARIFY's loss of pricing power going forward.

119. In February and March 2026, interim CEO Heino publicly acknowledged that, following the Company's significant acquisition activity in 2025, the portfolio and pipeline "was much too broad for us to take on at the size and scale we are and what our capitalization is," and that the Company had decided to narrow its strategic focus to radiodiagnostics and would "pursue value-maximizing alternatives for the radiotherapeutic assets in our pipeline." Heino further stated that these transactions "diversified, and will accelerate, our near-term revenue streams." These statements, made after the Company disclosed sustained pricing pressure and declining PYLARIFY revenue, reflect that the acquisition-driven expansion materially altered the Company's scale relative to its capitalization. When viewed in conjunction with contemporaneous internal reporting showing PYLARIFY rebate escalation, contract renegotiations, account losses, and revenue pressure during 2024 and 2025, this strategic retrenchment further supports a strong inference of defendants' scienter as the diversification efforts undertaken during the Class Period occurred amid known but undisclosed instability in the Company's core revenue base.

**Senior Executive Transitions**

120. In August 2025, just one day after Lantheus' dismal 2Q25 results were shared with investors reflecting the Company's disclosure of intensified competitive pricing pressure affecting PYLARIFY, defendant Morgan informed the Company she would take a leave of absence for "personal reasons," effective immediately.

121. In November 2025, defendants Markison and Blanchfield departed from Lantheus following the Company's 3Q25 disclosures regarding continued pricing pressure, net price compression, lost market share, and reduced guidance. Lantheus explained that Markison would retire and that Blanchfield had accepted a role at another company. Their sudden departures were announced without permanent successors in place on the same day the Company disclosed

intensified competitive pricing pressure, renegotiated contracts, net price compression, and guidance reductions affecting PYLARIFY, which accounted for a substantial portion of the Company's revenue.

122. By contrast, when prior CEO Heino announced her retirement after nine years in that role, Lantheus publicly announced a "CEO Succession Plan" and simultaneously identified Markison as her replacement, describing the transition as "part of a deliberate CEO succession process."

123. Lantheus' FY24 Form 10-K filed February 26, 2025, included a risk factor that stated, "[o]ur inability to . . . maintain an appropriate internal succession program . . . could have a material adverse effect on our business." Lantheus' Proxy Statement filed with the SEC on March 21, 2025 also described the Nominating and Corporate Governance Committee of the Board of Directors which, among other things, "oversee[s] succession planning for the CEO." These statements and responsibilities implied the importance to Lantheus, existence, and maintenance of an internal executive succession program.

124. *Seeking Alpha* commentary found that Markison's sudden departure without a succession plan in place raised suspicions that he was given a "graceful, semi-forced exit." The report further noted that Markison's likely successor, Blanchfield, "was announced in his new position only on November 11, suggesting that a) either the board didn't know Markison was leaving or b) didn't want Blanchfield to move up. Neither looks great."

125. The Company's Schedule 14A Proxy Statement filed with the SEC on March 12, 2026 included a footnote explaining "reimbursements for Ms Heino which represented a $20,000 benefits stipend and $14,877 for a planned trip cancelled to assume the Executive Chairperson role." It is reasonable to infer that Ms. Heino would not have planned a $14,877 trip that would

require the Company to reimburse her if the announcement of Markison's "retirement" in November had been anticipated.

## LOSS CAUSATION

126. During the Class Period, defendants made statements and omissions concerning PYLARIFY's reimbursement exposure, pricing stability, contract durability, and growth prospects. When defendants disclosed information contradicting those representations – including intensified pricing pressure, contract renegotiations, lost market share, and revised guidance – the market price of Lantheus common stock declined. These declines caused damage to plaintiffs and the Class (defined *infra* ¶134).

127. On November 6, 2024, following the Company's announcement of 3Q24 results, citing price competition and sustaining PYLARIFY's growth, Lantheus' stock price declined approximately 21%. On May 7, 2025, following the Company's announcement of 1Q25 results and reduced full-year guidance, citing MUC-related competitive disruption, Lantheus' stock price declined approximately 23%. On August 6, 2025, after the Company disclosed further revenue declines, intensified competitive pricing pressures, contract renegotiations, and continued net price compression, Lantheus' stock price declined approximately 29%. On November 6-7, 2025, following the Company's disclosure of additional PYLARIFY revenue declines, increased rebate activity, continued market share loss, and leadership changes, Lantheus' stock price declined approximately 11% over two days. These disclosures progressively revealed the scope and durability of reimbursement-driven pricing pressure and contract instability affecting PYLARIFY. The timing and magnitude of these declines correspond to the market's reaction to the corrective disclosures.

128. Contemporaneous analyst reports attributed the November 6, 2024 and May 7, August 6, and November 6-7, 2025 price declines to disclosures regarding pricing pressure, contract renegotiations, and reduced guidance for PYLARIFY's growth. Event-study analysis will demonstrate that these price declines were statistically significant and not attributable to market-wide or industry-wide factors:




129. The temporal proximity between the corrective disclosures and the corresponding stock price declines, together with analyst commentary attributing the declines to the newly disclosed information, demonstrates a causal connection between defendants' misrepresentations and investors' losses.

## LANTHEUS STOCK TRADED IN AN EFFICIENT MARKET

130. The Class Period inflation in the price of Lantheus stock was eliminated when the financial conditions, business risks, and other information concealed by defendants' fraud was revealed to the market.

131. At all relevant times, the market for Lantheus common stock was an efficient market for at least the following reasons:

(a) Lantheus stock met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly efficient and automated national stock market;

(b) as a regulated issuer, Lantheus filed periodic public reports with the SEC;

(c) according to the Company's FY24 Form 10-K, there were over 68.4 million shares of Lantheus common stock outstanding as of February 26, 2025;

(d) during the Class Period, more than one million shares (on average) of Lantheus stock traded on a daily basis, demonstrating an active and broad market for Lantheus stock;

(e) Lantheus regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of news releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures;

(f) Lantheus was followed by many securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective firms during the Class Period and each of these reports was publicly available and entered the public marketplace; and

(g) unexpected material news about Lantheus was rapidly reflected in and incorporated into prices for Lantheus common stock during the Class Period.

132. As a result of the foregoing, the market for Lantheus common stock promptly digested current information regarding Lantheus from publicly available sources and reflected such information in the price of Lantheus stock. Under these circumstances, all purchasers of Lantheus stock during the Class Period suffered similar injury through their purchases of Lantheus stock at artificially inflated prices, and a presumption of reliance applies.

133. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on defendants' material omissions. Because defendants omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, positive proof of reliance is not required. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period omissions set forth above, that requirement is satisfied here.

## CLASS ACTION ALLEGATIONS

134. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all who purchased or otherwise acquired Lantheus stock during the Class Period and were damaged thereby (the "Class"). Excluded from the Class are defendants, the Company's officers and directors, as well as their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

135. The Class members are numerous and geographically dispersed, making joinder of all members impracticable. Throughout the Class Period, Lantheus stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to plaintiffs, Lantheus

reported over 68.4 million shares of Lantheus common stock outstanding as of February 26, 2025 and Yahoo!Finance reports that over 600 institutions hold Lantheus shares. Record owners and other Class members may be identified from records maintained by Lantheus or its transfer agent and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class. Accordingly, plaintiffs reasonably believe that there are hundreds, if not thousands, of Class members.

136. Plaintiffs' claims are typical of the Class members' claims, as all Class members are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein. Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

137. Plaintiffs will fairly and adequately protect the Class members' interests and have retained counsel competent and experienced in class and securities litigation.

138. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

(a) whether defendants violated the federal securities laws as alleged herein;

(b) whether the price of Lantheus stock was artificially inflated during the Class Period; and

(c) the extent of injuries sustained by the Class members and the appropriate measure of damages.

139. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Since the damages

suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in managing this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and SEC Rule 10b-5 Against All Defendants

140. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

141. Defendants violated §10(b) of the 1934 Act and SEC Rule 10b-5 throughout the Class Period in that they engaged in a plan, scheme, and course of conduct that was intended to and did: (i) deceive the investing public, including plaintiffs and the Class, as alleged herein; and (ii) cause plaintiffs and the Class to purchase Company common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, defendants, and each of them, took the actions set forth herein.

142. Defendants violated §10(b) of the 1934 Act and SEC Rule 10b-5 during the Class Period in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon plaintiffs and others similarly situated in connection with their purchase of the Company's common stock. As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

## COUNT II

**For Violation of §20(a) of the 1934 Act**
**Against All Defendants**

143. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

144. During the Class Period, defendants acted as controlling persons of Lantheus within the meaning of §20(a) of the 1934 Act. By virtue of their positions with the Company and the actions taken as described herein, the Individual Defendants had the power and ability to control, and did control, the actions of Lantheus and its employees. Lantheus controlled the Individual Defendants and its other officers and employees. Defendants each participated in and are culpable for and by virtue of the acts alleged herein. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

A. Declaring this action to be a proper class action, certifying Indiana Public Retirement System as a Class representative under Rule 23 of the Federal Rules of Civil Procedure, and its counsel as Lead Counsel;

B. Declaring that defendants are liable pursuant to the 1934 Act;

C. Awarding damages in favor of plaintiffs and the Class against defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D. Awarding plaintiffs and the Class reasonable attorneys' fees, costs, and expenses incurred in this action; and

E. Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: March 13, 2026

ROBBINS GELLER RUDMAN
& DOWD LLP
DAVID A. ROSENFELD

s/ David A. Rosenfeld
DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
drosenfeld@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
DANIELLE S. MYERS (admitted *pro hac vice*)
MICHAEL ALBERT (admitted *pro hac vice*)
KEVIN S. SCIARANI (admitted *pro hac vice*)
KENNETH P. DOLITSKY (admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
dmyers@rgrdlaw.com
malbert@rgrdlaw.com
ksciarani@rgrdlaw.com
kdolitsky@rgrdlaw.com

Lead Counsel for Lead Plaintiff

LEVI & KORSINSKY, LLP
SHANNON L. HOPKINS
GREGORY M. POTREPKA
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: 203/992-4523
shopkins@zlk.com
gpotrepka@zlk.com

Additional Counsel